**BANK ONE TEXAS, N.A.,**
Plaintiff, Appellee,

v.

**A.J. WAREHOUSE, INC., et al.,**
Defendants, Appellants.

No. 91–1826.

United States Court of Appeals,
First Circuit.

Heard March 3, 1992.
Decided June 30, 1992.

Bernard J. Bonn III, with whom John P. Dennis, Timothy C. Blank and Dechert Price & Rhoads, Boston, Mass., were on brief, for appellants.

Kathryn S. Shea, with whom John M. Harrington, Jr. and Ropes & Gray, Boston, Mass., were on brief, for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL and WEIS,* Senior Circuit Judges.

TORRUELLA, Circuit Judge.

The cast of characters in this case reads like a García Márquez novel. It involves an appeal from a summary judgment issued by the United States District Court for the District of Massachusetts in favor of Bank One Texas, N.A. ("Bank One"), and against Leaseway Transportation Corporation and its related corporations, (collectively "the Companies").[1] The Companies allege that there are material issues of genuine fact which make summary judgment in this case inappropriate. We disagree and affirm the judgment of the district court.

## FACTS

### The Merger

Leaseway Transportation Corporation ("Leaseway"), is a holding company organized and existing under the laws of Dela-ware. Leaseway has approximately 70 subsidiaries at the present, from which it derives all of its revenue. Until June 25, 1987, Leaseway was a publicly held company with its capital stock listed on the New York Stock Exchange. On that date, LTC Acquisition Company, a wholly-owned subsidiary of Leaseway Holdings, Inc., ("Holdings"), was merged with Leaseway, and as a result of the merger, Leaseway became a wholly-owned subsidiary of Holdings. Holdings is a privately owned corporation.

### The Loans

To obtain part of the funds to finance the referenced merger and to obtain additional working capital, revolving credit funds and letters of credit, Holdings, Leaseway and substantially all of Leaseway's subsidiaries, (i.e., the Companies), on June 25, 1987, executed and delivered a Revolving Credit Term Loan Agreement ("credit agreement"), to a consortium of 20 lending banks (collectively "the Banks"), including MBank Dallas, N.A., predecessor-in-interest to Bank One, with the First National Bank of Boston, as agent.

Since the date of its execution the credit agreement has been amended 18 times. In May of 1990, Credit Agricole replaced First National as the agent bank under the credit agreement as amended, and Pittsburgh National Bank became the administrative agent.

The Banks loaned the Companies the aggregate sum of $382,000,000, consisting of $230,000,000 in revolving credit loans and $152,000,000 in term loans. Each bank's revolving credit loan was subject to the terms and conditions of the credit agreement and was evidenced by a separate promissory note ("revolving credit note") payable to that bank. Similarly, each bank's term loan was subject to the credit agreement and was evidenced by a second separate promissory note ("term note") payable to the bank.

MBank Dallas' initial commitment was approximately 3% of the amounts loaned.

---

* Of the Third Circuit, sitting by designation.

1. There are a total of 71 defendants-appellants—

A.J. Warehouse, et al.

Thus, MBank made a $10,440,000 revolving credit loan and a $4,560,000 term loan, for a total of $15,000,000.[2] These notes were passed on by MBank to its successor, Bank One.

### The Credit Agreement

The credit agreement was structured to permit ongoing credit advances to the Companies by the participating Banks. If a participating bank withdraws from providing ongoing credit advances under the credit agreement, thus reducing its commitment percentage to zero, it becomes a "terminating bank." A key provision of the credit agreement, for the protection of the "non-terminating banks," prevents terminating banks from interfering with the administration of the credit by providing, in section 14.2, that if for any reason a Bank receives any payment of past due principal or interest from the Companies, it may not retain any portion of the payment in excess of its "ratable share" of the payments received by all banks. Under the same section, each individual bank's "ratable share" of payments received under the credit agreement is defined as its "commitment percentage."

On December 31, 1989, Bank One became a terminating bank under section 2.2 of the credit agreement by reducing its "commitment percentage" under the credit agreement to zero when it refused to participate in further loans to the Companies under the credit agreement terms.

**2.** While the complaint filed by Bank One says the term note was in the amount of $4,506,000, the term note itself says the amount due thereunder is $4,560,000. We cite the amount on the term note. Further, appellants claim that the actual amount of the credit revolving loan is $6,900,000. We cite the amount on the revolving credit note—$10,440,000. We note that since Bank One is suing only for past due amounts, these discrepancies do not present an issue of material fact.

**3.** Bank One alleged that the Companies owed Bank One principal payments under the term note in the amount of $800,000 as of December 31, 1990, and in the amount of $974,834 under the revolving credit note as of December 31, 1990.

### Loan Payments

Section 6.7 of the credit agreement requires that the Companies make all payments under the credit agreement, including those under the notes, to the administrative agent (Pittsburgh National Bank). The administrative agent then remits to each bank its pro rata share of the payment. The notes themselves also provide for direct payment to the agent bank.

On October 5, 1990, Credit Agricole, Bank One's agent bank, informed Bank One that under section 14.2 of the credit agreement Bank One's ratable portion of any payment from the Companies, as a terminating bank, was zero. Bank One responded on November 14, 1990, stating its disagreement with that position and thereafter, on November 26, 1990, demanded payment from the Companies in the amount of $1,774,834 which it alleged was the principal and interest past due.[3]

On November 29, 1990, Credit Agricole wrote Bank One claiming that, pursuant to the credit agreement, if it received any payment from the Companies, it would be required "to distribute the entire payment to other Banks." Nevertheless, on December 4, 1990, the Companies replied to Bank One, supporting the administrative agent's position and adding that the Companies would be at risk to other Banks if they made any payment to Bank One without approval of the other Banks.[4]

### The Law Suit

On January 31, 1991, plaintiff-appellee, Bank One, filed this diversity action in dis-

**4.** Section 17 provides that the Companies jointly and severally "agree to indemnify and hold harmless ... each Bank ... from and against all damages [or] losses" resulting from transactions contemplated under the terms of the Credit Agreement. In addition, section 11.2 prohibits the Companies from permitting any lien to be imposed on their assets except in accordance with the provisions of the Credit Agreement.

The actions of Bank One can only result in the imposition of liens on the Companies' assets which is inconsistent with the terms of the credit agreement, and to the detriment of the other non-terminating banks.

trict court against defendants-appellants, the Companies, i.e., Leaseway Transportation Corporation and its related corporations. The complaint alleges that the Companies owe Bank One accrued principal and interest under the credit agreement and the notes.[5] Bank One moved for summary judgment.

The Companies sought discovery relating to Bank One's negotiation, preparation and execution of the credit agreement and the notes, the obligations of the Companies under those documents, and the factual basis for the statements and contentions in the Edge affidavit.[6] The district court denied discovery.

The Companies filed a Motion to Dismiss on the grounds that Bank One had failed to join indispensable parties.

The district court denied the Companies' Motion to Dismiss, and ruled on the Motion for Summary Judgment without allowing discovery. It entered judgment in favor of Bank One in the amount of the past due principal, $3,258,287.54. 137 F.R.D. 631.

The Companies appeal.

## STANDARD OF REVIEW

■ Summary judgment is proper when there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The district court's grant of summary judgment is subject to *de novo* review by this court. *Fowler v. Boise Cascade Corp.*, 948 F.2d 49 (1st Cir. 1991); *Catrone v. Thoroughbred Racing Assocs. of N.A.*, 929 F.2d 881, 884 (1st Cir.1991). We consider the facts in the light most favorable to the non-movant. *See, e.g., Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 804 (1st Cir.1987).

## LEGAL ANALYSIS

### I. The Credit Agreement

Appellants submit that summary judgment should have been denied because there are genuine issues of material fact to be adjudicated. They specifically allege that the district court incorrectly concluded that the Companies' and all of the non-terminating banks' interpretation of section 14.2 of the credit agreement does not present an issue of fact. Rather, they claim, Bank One and the Companies directly dispute whether, under the credit agreement, Bank One is entitled to any payments at this time since Bank One is a terminating bank. Bank One asserts that it is entitled to payment, while the Companies contend that Bank One is not so entitled.

■ The credit agreement specifically provides that it is to be construed in accordance with Massachusetts law.[7] It is well settled in Massachusetts, with regard to written contracts,

> that it is only where more than one view can be taken of the evidence respecting the circumstances of the parties and the condition of the subject with which they are dealing that a proper case arises for the jury, and that *where, as here, there is no dispute as to the facts to be applied to the terms of the contract, the interpretation of the contract in their light is still to be treated as a question of law for the judge.*

*Ober v. National Casualty Co.*, 318 Mass. 27, 60 N.E.2d 90, 91 (1945) (citations omit-

---

**5.** On July 19, 1991, despite earlier assertions that no interest was owed, the companies paid interest to Bank One. The amounts paid were $94,574.30 on the term note and $273,349.69 on the revolving credit note. According to Bank One, these amounts covered the period of December 31, 1990 to June 30, 1991 and were actually higher than they should have been as per the bank's calculations. Thus, the issue of interest is moot.

As of July 31, 1991, the past due and owing principal was $1,499,999.90 under the term note, and $1,758,287.64 under the revolving credit note for a total of $3,258,287.54. This is the amount Bank One seeks to recover.

**6.** Bank One filed its motion for summary judgment based on the affidavit of Cheryl D. Edge, the keeper of records of Bonnet Resources Corporation, an agent for Bank One, who had no personal knowledge of the negotiation of the Credit Agreement.

**7.** *See* Credit Agreement, section 21.

ted) (emphasis added). Moreover, "so long as the words of an agreement are plain and free from ambiguity, they must be construed in their ordinary and usual sense." *McDonald's Corp. v. Lebow Realty Trust,* 888 F.2d 912, 913–14 (1st Cir.1989) (citing *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 494 N.E.2d 374, 378 (1986)). Furthermore, a contract is to be construed so as to give reasonable effect to each of its provisions. *J.A. Sullivan Corp.,* 494 N.E.2d at 378 (citing *McMahon v. Monarch Life Ins. Co.,* 345 Mass. 261, 264, 186 N.E.2d 827 (1962)).

Having established the legal framework, we turn to the credit agreement at issue in the present case.

■ We recount at the outset the undisputed facts. It is undisputed that MBank Dallas, one of the banks, and the predecessor in interest to Bank One, and the Companies entered into a credit agreement. It is also undisputed that Bank One holds two notes subject to the terms of the credit agreement, both of which are past due, i.e., there is no question that the Companies are in default. As the district court found, Bank One is clearly authorized under the plain terms of section 14.1 of the credit agreement to bring suit for amounts past due against any or all the borrowers in the event of default. More specifically, section 14.1 of the credit agreement reads:

**Rights of Banks.** If any one or more of the Events of Default specified in § 12 shall have occurred and be continuing, and whether or not acceleration of the Notes shall have occurred pursuant to § 12, (a) *any Bank may proceed to protect and enforce its rights by suit in equity, action at law and/or by other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and, if the Notes shall have become due, by declaration or other-*

*wise, proceed to enforce the payment of such Notes or any other of its legal or equitable rights ...*

(Emphasis added). There is no ambiguity in the language of section 14.1 and appellants point to no term giving rise to any ambiguity. Instead they argue that section 6.7 directs the Companies to make payment to the administrative agent. While this is true, it is no less true that section 6.7 does not operate in the event of default.[8] It is sections 12 through 14 that address default specifically, with section 14.1 clearly stating that in the event of default any bank may take legal action against the borrowers and secure a judgment.

■ However, appellants argue that because Bank One is a terminating bank whose commitment percentage is zero, it is not entitled to any payment by the Companies. According to the Companies' interpretation of section 14.2, Bank One is only entitled to payment from the Companies if the Non–Terminating banks consent, or if they are paid in full.

We find no language in section 14.2 that supports this argument. In fact, section 14.2 would seem to indicate to the contrary:

§ 14.2. Set–Off. ... Each Bank further agrees with the other Banks that if such Bank shall both (i) receive from the Companies or from any other source whatsoever, *whether by voluntary payment, exercise of the right of set-off, counterclaim, cross action, or enforcement of any claim evidenced by the Notes or this Agreement, or by proof thereof in bankruptcy, reorganization, liquidation, receivership or similar proceedings, or otherwise,* and (ii) retain and apply to the payment of the amounts owing with respect to the Notes or of any amounts due to such Bank under this Agreement any amount which is in excess of its ratable portion of the pay-

---

**8.** Section 6.7 reads:
*Place and Mode of Payments.* All payments due hereunder shall be made by the Companies to the Administrative Agent at its Head Office, in immediately available funds by 12:00 noon Eastern time.... Upon receipt by the Administrative Agent of any such pay-

ment, the Administrative Agent shall remit to each Bank on the same day, its *pro rata* share of such payment. The Companies' payment of any amount due hereunder to the Administrative Agent shall conclusively evidence their payment of such amounts due hereunder.

ments received by all of the Banks, *then such Bank will make such disposition and arrangements with the other Banks with respect to such excess, either by way of distribution until the amount of such excess has been exhausted, assignment of claims, subrogation or otherwise,* as shall result in each such Bank receiving in respect of its Notes and the amounts due such Bank under this Agreement its ratable share of all such payments. For purposes of this § 14.2, each Bank's ratable share of payments received hereunder shall be deemed to be its Commitment Percentage of such payments.

(Emphasis added). A close analysis of section 14.2 demonstrates that the credit agreement envisioned a law suit by any bank in the event of default. The purpose of this section is to specify what portion of the payments made by any of the Companies to a particular bank may be retained by that bank. This section provides that if a bank receives a payment from a company and such payment is in excess of that bank's "ratable portion of the payments received by all the banks," then such bank will distribute said excess among the other banks until the amount retained equals that bank's ratable share. Thus, section 14.2 anticipated that payment would be made to a bank directly, even if said bank's commitment percentage was zero. Therefore, the language of section 14.2 provided no support for appellants' argument, since it only addresses how payments to the banks will be shared or divided.

We find it significant that section 14.1 precedes section 14.2 in the Credit Agreement, so that the agreement first grants the banks the right to sue for any amount due to it under the notes, and then, in section 14.2, it designates what portion of the amount recovered may be kept by the bank. Thus, for purposes of the present case, the language of section 14.2 is irrelevant as no payment has yet been made. Section 14.2 goes into effect only when payment is made.

Appellants also cite a letter from the agent bank in support of their proposition. They claim that:

Credit Agricole asserted in various letters to Bank One that because Bank One was a Terminating Bank, as defined in the Credit Agreement, it was not entitled to any payments from the Companies.

Appellants' Brief at 21 (emphasis in original). We read Credit Agricole's letter differently. In its letter to Bank One dated November 29, 1990, the agent bank stated:

Please be advised that ... *if you receive any payments* from the Companies pursuant to your demand, such payments will be for the pro rata benefit of the banks ... § 14.2 requires you to distribute the entire payment to the other banks.

Letter of Credit Agricole, dated November 29, 1990 (emphasis added). It is clear from the language of the letter that the agent bank was well aware that Bank One may sue the Companies for any amount owed under the notes. In fact as the letter reads: "if you receive any payment from the Companies,"—it indicates that the author envisioned the possibility of payment being forwarded to the bank itself as a result of a court judgment. Thus the letter simply served as a warning that if Bank One was successful in recovering any money from the Companies, section 14.2 would come into effect and Bank One would be required to share said money with the other banks. Nowhere in the letter does the agent bank even suggest that Bank One was not entitled to any payment.

The Companies suggest that if judgment is accorded Bank One, they will be liable to the other banks in the case that Bank One refuses to share the payments with the other banks as directed by section 14.2. We find it unnecessary to enter into such speculations to properly render a decision in this case.

The intent of the parties is clear from the plain language of the Credit Agreement. Accordingly, as there are no genuine issues of material fact, we affirm the decision of the district court.

## II. Denial of Discovery

Appellants also appeal from the district court's order denying discovery. Appel-

lants sought discovery on the issue of whether Bank One is presently entitled to any payments under the terms of the credit agreement.[9] More specifically the Companies urged the district court to allow discovery so as to ascertain the intent of the parties when they entered into the credit agreement.

■ To satisfy Rule 56(f), a party must "articulate a plausible basis for the belief that discoverable materials exist which would raise a trialworthy issue." *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991). The district court's denial of a Rule 56(f) motion is reviewable only for abuse of discretion. *Id.* We note that "a court may grant summary judgment despite an opposing party's claim that discovery would yield additional facts where the opposing party has not alleged specific facts that could be developed through such discovery." *Taylor v. Gallagher*, 737 F.2d 134, 137 (1st Cir.1984).

■ Thus, where like here, the intent of the parties is clear and free from ambiguity from the plain language of the agreement, discovery was not compelled. The only fact on which appellants sought discovery was regarding the intent of the parties when they entered into the Credit Agreement. However, as we stated above, when the intent of the parties is clear from the written language of the agreement, the interpretation of such agreement is a matter of law for the judge to decide from the plain terms of the document. *See Ober*, *supra*, 60 N.E.2d at 91. Therefore we find no abuse of discretion on the part of the district court in denying discovery.

### III. Rule 19(a)

■ Last, appellants submit that the district court erred when it failed to dismiss Bank One's complaint for nonjoinder pursuant to Rule 12(b)(7) and 19(a)(2) of the Federal Rules of Civil Procedure. According to the Companies, the Banks were all indispensable parties to the resolution of this dispute.

Under Rule 19(a)(2) a party is only necessary if:

> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
>
> (i) as a practical matter impair or impede the person's ability to protect that interest or
>
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a)(2).

Appellants assert that under the factual inquiry prescribed by Rule 19(a)(2), the Banks must be joined to fully adjudicate this matter, though they are not holders of the notes giving rise to this action.

In light of our previous analysis, we do not feel that disposition of this action in the absence of the Banks would leave the Companies subject to a substantial risk of incurring double obligations. To so hold would necessarily require our entering into issues not relevant to the disposition of this case—essentially whether Bank One is obligated to share any payment it receives from the Companies, and if so, whether Bank One will share said payments. We do not reach, nor need we reach these issues to fully adjudicate this matter. Nor are we impeding the Banks from protecting any interest they might have in the payments made to Bank One by not joining them to this action. In fact, the district court noted in its Memorandum of Decision, 137 F.R.D. at 632 n. 2, that "[a]lthough they are aware of it, the other banks have yet to show any interest in participating in this litigation." The reason for this is clear, the other Banks will have no interest in this litigation until Bank One has actually recovered the amount due.

---

**9.** The Companies also sought discovery relating to the amount allegedly borrowed from Bank One, the calculation of amounts allegedly due and owing to Bank One, and if payments were due, to whom such payments should be made.

However, appellants have offered no evidence to contradict the appellees assertions as to each of these issues, accordingly the prima facie case of Bank One stands uncontested.

Thus, the Banks are not necessary parties under 19(a) nor can they be indispensable parties under 19(b). *See Pujol v. Shearson American Express, Inc.*, 877 F.2d 132, 135, 138 (1st Cir.1989).

AFFIRMED.