**Michael D. BANK, Thomas M. Dusel, and Robert J.M. O'Hare, Jr. in their capacity as Trustees of 400 Wyman Street Trust, Plaintiffs,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**CA No. 95–12261.**

United States District Court,
D. Massachusetts.

Feb. 14, 1996.

Saul A. Schapiro, Rosenberg, Rosenfeld & Schapiro, Boston, MA, David W. Rosenberg, Rosenberg, Rosenfeld & Schapiro, Boston, MA, for Michael D. Bank.

Saul A. Schapiro, Schapiro, Hays & Kelly, Boston, MA, for Thomas M. Dusel, Robert J.M. O'Hare, Jr.

J. Charles Mokriski, Jonathan I. Handler, Day, Berry & Howard, Boston, MA, for Defendant.

## MEMORANDUM

TAURO, Chief Judge.

At issue is Plaintiffs' Motion, as Trustees of the 400 Wyman Street Trust (the "Trust"), to compel Defendant International Business Machines Corporation ("IBM") to arbitrate their disagreement concerning the purchase of a mortgage note by an affiliate of the Trust.

## I.

### BACKGROUND

The Trust is the managing partner of 404 Wyman Street Associates (the "Partnership"), a general partnership of which the Trust and IBM are the two partners. The Trust has a 51% interest in the Partnership, while IBM retains a 49% interest. The terms of the Partnership are described in a partnership agreement (the "Agreement") executed on September 17, 1986. The Partnership was created to build, develop, and manage an office building located at 404 Wyman Street in Waltham, Massachusetts.

Under the terms of the Agreement, the Trust contributed the undeveloped parcel at 404 Wyman Street and IBM contributed a one million dollar capital contribution. IBM also agreed under Section 3.2 of the Agreement to contribute additional funds needed by the Partnership for any purpose, upon notice from the Managing Partner. IBM's potential remaining capital obligation under Section 3.2 is approximately 17.5 million dollars.

The Partnership financed the construction of 404 Wyman Street with a non-recourse loan (the "note") from Citicorp Real Estate, Inc. ("Citicorp"), secured by a mortgage on the land, the office building, and the leases owned by the Partnership. The note matures in May of 1997. In March 1995, there remained an outstanding principal balance on the Citicorp loan in the amount of approximately seventy-two million dollars.

During 1995, the Trust sought to restructure the loan to reduce the debt service expenses and assure the long term financial stability of the project. In early 1995, the Trust felt that restructuring was not possible on terms attractive to the Partnership. The Trust, however, believed that Citicorp's offer to sell the note in its entirety for approximately fifty-three million dollars was an attractive option.[1]

The purchase of the note had to be made quickly because Citicorp imposed a deadline of March 31, 1995. In February 1995, IBM expressed its unwillingness to acquire the note on Citicorp's terms.

To preserve the business opportunity, the Trust, with full disclosure to IBM, caused an affiliated entity, the Wyman Loan Corporation ("Wyman Loan") to purchase the note from Citicorp and to hold the note for resale to the Partnership at its cost. The note was purchased by Wyman Loan on March 31, 1995 for fifty-three million dollars plus approximately one million dollars in outstanding interest due to Citicorp.

On May 9, 1995, the Trust formally proposed to IBM that it approve the Partnership's proposed decision to purchase the note from Wyman Loan for approximately fifty-four million dollars. The money for the purchase price would presumably come from additional financing in the form of a mortgage less IBM's capital contribution under Section 3.2. On May 18, 1995, IBM refused to acquire the note from Wyman Loan, stating that the purchase price was too high.

On June 12, 1995, the Trust filed a demand for arbitration with the American Arbitration Association ("AAA"). On June 14, 1995, IBM sent the AAA a letter stating that the issue the Trust wanted to arbitrate was not arbitrable.

Thereafter, the Trust filed an action in Middlesex Superior Court to compel arbitration. IBM subsequently removed the case to this court.

## II.

### ANALYSIS

In seeking to compel arbitration of the dispute regarding the proposed purchase of the note from Wyman Loan, the Trust argues that the purchase concerns the financing or refinancing of the Partnership assets and, therefore, is arbitrable. IBM counters that the purchase of the note is not a refinancing but rather an acquisition of an interest in land, which is not arbitrable. IBM also argues that the Trust is in default and, thus, cannot compel arbitration.

---

1. The negotiations were complicated by the fact that Citicorp had sold or assigned the note to several foreign banks. Based on the parties' submissions, the precise relationship between Citicorp and the foreign banks is unclear.

## A. Standard for Determining Arbitrability under a Contract

 In Massachusetts, arbitration clauses are "valid, enforceable, and irrevocable" pursuant to the Massachusetts Uniform Arbitration Act, M.G.L. ch. 251 § 1 et seq. ("UAA").[2] Section 2 of the UAA provides that when a party refuses to arbitrate a dispute, the opposing party may apply to the Superior Court for an order directing arbitration. M.G.L. ch. 251 § 2. The court will then order arbitration if it finds that a valid agreement to arbitrate exists. *Town of Danvers v. Wexler Constr. Co., Inc.*, 12 Mass. App.Ct. 160, 162, 422 N.E.2d 782, 783 (1981). In making this decision, the court is guided by the strong public policy in favor of arbitration as an expeditious alternative to litigation. *Id.* Whether a particular agreement calls for arbitration is a question of law for the court to decide by applying general principles of contract law. *See Mobil Oil Corp. v. Local 8–766*, 600 F.2d 322, 325 (1st Cir.1979). In making its determination, the court will therefore construe an agreement as a whole, in a reasonable and practical way, consistent with its language, background and purpose, giving effect to each of its provisions. *Bank One Texas, N.A. v. A.J. Warehouse, Inc.*, 968 F.2d 94, 98 (1st Cir.1992); *USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass.App. Ct. 108, 117, 546 N.E.2d 888, 893 (1989), *rev. denied*, 406 Mass. 1104, 550 N.E.2d 396 (1990).

 Agreements should also be construed in accordance with justice, common sense, and the probable intention of the parties. *Bowser v. Chalifour*, 334 Mass. 348, 352, 135 N.E.2d 643, 645 (1956). In doing so, the court will attempt to avoid unjust or unreasonable results, *Marcus v. Boston Edison Co.*, 317 Mass. 1, 6, 56 N.E.2d 910, 912 (1944), and give effect to the agreement as a rational business instrument. *McMahon v. Monarch Life Ins. Co.*, 345 Mass. 261, 264, 186 N.E.2d 827, 830 (1962). Guided by these principles, the court now examines the terms of the Agreement.

## B. The Relevant Terms and Structure of the Agreement

The Agreement provides that all major decisions, as defined in Exhibit D, require the approval of the partners. (Art. VI § 6.7). Exhibit D lays out the standards and procedures for resolving disputes between the partners regarding "Major Decisions." Section A outlines those decisions not subject to arbitration:

> (a) either Partner ... may withhold its approval for any reason, or for no reason, in its sole and complete discretion, without regard to whether the withholding of such approval is *unreasonable or arbitrary;* (b) *a deadlock* on any one or more of them *will not trigger* either the buy-out provisions of Section 8.3 of the Agreement or *the arbitration provisions of Article XI* of the Agreement; and

> (c) a Partner, with respect to which an Event of Default exists, will continue having the right of approval notwithstanding the uncured Event of Default.

(emphasis added). One of the "Major Decisions" in Section A concerns the acquisition of land. Section A(3) states that:

> *acquiring any land or other real property or any interest therein* (other than utility or right of way easements or similar real property interests) for the benefit of the Project[3] or Partnership (without limitation, any decision to exercise any rights

---

2. Because the Agreement calls for the use of Massachusetts law in determining the rights and obligations of the parties, Art. XIV § 14.7, the court will use the UAA rather than the Federal Arbitration Act (the "FAA"), 9 U.S.C.A. § 2 (West.Supp.1994). *In re Newport Plaza Associates v. Durfee Attleboro Bank*, 985 F.2d 640, 643 (1st Cir.1993) (court will defer to the choice of law provisions contained within the Agreement absent any jurisdictional concerns).

The FAA is more favorable to arbitration than the UAA. Under the FAA, any doubts regarding arbitrability should be resolved in favor of coverage under the Agreement unless it "can be said with positive assurance that the arbitration clause is not susceptible of interpretation that covers the asserted dispute." *Peerless Pressed Metal Corp. v. International Union of Elec., Radio and Machine Workers, AFL–CIO*, 451 F.2d 19, 19–20 (1st Cir.1971), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973).

3. The Agreement defines the term "Project" as the office building located at 404 Wyman Street. ((Art. I § 1.1(57); Exhibit B)).

which the Partnership may be granted to acquire, develop or occupy the property now known as 590 Lincoln Street, Waltham, Massachusetts shall be a Section A Major Decision).

(emphasis added). IBM contends that this provision governs the proposed purchase of the note from the Wyman Loan, thereby, rendering the deadlock concerning the note's purchase unarbitrable pursuant to Section A(b).

Section C deals with those decisions subject to arbitration. It provides that:

(a) a Partner *may not unreasonably withhold* or delay its approval of any one of the Major Decisions listed below in this Section C, and the standard provided in Section 11.1 of the Agreement shall be applicable if the arbitration provisions of Section 11.1 are invoked, unless another standard is provided herein;

(b) *a deadlock* on any one or more of them *will trigger the arbitration provisions of Article XI* of the Agreement ...

(c) notwithstanding any other provisions of the Agreement or this Exhibit D, a Partner, with respect to which an Event of Default exists, shall not have the right of approval while the Event of Default remains uncured.

(emphasis added). One of the "Major Decisions" in Section C concerns the refinancing of 404 Wyman Street. Section C(13) states that:

financing or refinancing of the Partnership assets or Partnership Distributive Shares including, without limitation, financing the acquisition of the Project Site, the construction of the Project, construction and permanent term financing of the Project, *or refinancing of any part or all of the Project* ... The standard for arbitration described in Section C(13) shall be the standard provided in Section 11.1 of the Agreement, except that *the particular financial position of the Partners shall not be considered.*

(emphasis added). The Trust contends that this provision governs the proposed decision to purchase the note and as such the present

deadlock between itself and IBM becomes arbitrable pursuant to Section C(b).

Equipped with the relevant terms of the Agreement, the court now analyzes whether the proposed decision to purchase the note from Wyman Loan is subject to arbitration.

C. *The Proposal to Purchase the Note from Wyman Loan Corporation is a Refinancing of the Property under Section C(13)*

 A common sense reading of the structure and terms of the Agreement leads the court to conclude that the proposed decision to acquire the note from Wyman Loan is a refinancing under C(13) rather than an acquisition of an interest in land under Section A(3). The court rests this conclusion on four considerations.

 *First,* the purchase of the note from Wyman Loan is not an acquisition of any additional interest in property, because the Partnership already owns the property within the meaning of Section A(3). In contending to the contrary, IBM clings to Massachusetts' peculiar status as a "title theory" state.

 In Massachusetts, the granting of a mortgage "vests title in the mortgagee to the land placed as security for the underlining debt. The mortgage splits the title in two parts: the legal title, which becomes the mortgagee's, and the equitable title, which the mortgagor retains." *Maglione v. Banc-Boston Mortgage Corp.,* 29 Mass.App.Ct. 88, 88, 557 N.E.2d 756, 756 (1990). The mortgagee holds legal title to the property, until such time as the mortgagor pays off the mortgage. *Id.* at 89–90, 557 N.E.2d at 757. At that point, the equity interest (often called the equity of redemption) merges with the legal title and the mortgagee's interest in the property comes to an end. *Id.*

 The purpose of vesting legal title in the mortgagee is to secure the debt owed by the mortgagor. *Milton Sav. Bank v. United States,* 345 Mass. 302, 304, 187 N.E.2d 379, 381 (1963). Indeed, the mortgagee may enter into possession of the mortgaged property upon default and before foreclosure. *Maglione,* 29 Mass.App.Ct. at 90, 557 N.E.2d at 757. This process differs from

that in a "lien theory" jurisdiction. There the mortgagor retains legal title. Upon default, the mortgagee must await foreclosure before obtaining satisfaction from the debt. *Id.* Arguably, the right of possession under a "title theory" gives the mortgagee better control in satisfying the debt. *Id.* Nevertheless, if other means exist to satisfy the debt, the vesting of legal title in the mortgagee in a "title theory" state has no practical significance. *Id.*

 Noting that Massachusetts is a "title theory" state, IBM argues that the Partnership will acquire a new interest in property under Section A(3) by purchasing the note, because the equity of redemption held by the Partnership will merge into the legal title. The court disagrees. The legal fiction created by the vesting of legal title in the mortgagee does not effect the everyday ownership rights of the mortgagor. While the mortgagee may technically have legal title to the mortgaged property, the mortgagor is considered the "owner" of property. *Guleserian v. Pilgrim Trust Co.*, 331 Mass. 431, 433, 120 N.E.2d 193, 195 (1954) (stating that while a "mortgagee has the legal title to the mortgaged property, subject to defeasance, and in this aspect he is the 'owner,' but for most purposes and according to popular understanding the mortgagor is considered the 'owner' of the mortgaged property"). In the context of ordinary business transactions, therefore, the Partnership is deemed to be the owner of 404 Wyman Street.

Moreover, the terms of the Agreement support the notion that the Partnership owns 404 Wyman Street. Section 12.1 of the Agreement required Wyman to transfer to the Partnership the property at 404 Wyman Street to the Partnership "together with all rights, appurtenances, easements, rights-of-way and other interests appertaining to the Property ..." (Art. XII § 12.1(a)). The Agreement also required the Partnership to obtain title insurance, "insuring fee simple ownership of the Partnership in and to the Property ..." (Art. XII § 12.1(b)). Furthermore, the language of Section A(3), which states "*any* land or *other* real property or any interest therein" (emphasis added), supports the conclusion that Section A(3) deals

with property other than 404 Wyman Street. As such, the only reasonable interpretation of the Agreement is that no acquisition of any interest in real property will occur from purchasing the note. The Partnership already owns 404 Wyman Street and will continue to do so after the purchase.

*Second,* the proposed decision to purchase the note falls within the language of Section C(13), because it constitutes a refinancing of 404 Wyman Street. As IBM conceded at oral argument, if the proposed action was for the restructuring of the note, rather than its purchase, then Section C(13) would apply. But, there is no substantive difference in this context between a restructuring and the proposed purchase. In either event, the Partnership retains ownership of the property throughout.

To make the point, the court adopts the hypothesis suggested by counsel for the Trust. Assume that, instead of selling the note outright, Wyman Loan retained one dollar debt on the note. That decision would clearly be a refinancing because the equity of redemption would not merge with the legal title. The interpretation of the Agreement suggested by IBM cannot reasonably turn on the payment, more or less, of a hundred pennies.

A decision regarding the financing or refinancing of the note under Section C(13) is encompassed by the proposed decision to purchase the note from Wyman Loan. The Trust's decision to acquire the note from Wyman Loan for fifty-four million dollars will require additional financing beyond the capital contributions IBM must make pursuant to Section 3.2 of the Agreement. This financing will take the form of a new mortgage on the property. The structure of this action explicitly falls within the language of Section C(13). To refinance something means to "finance again or anew; to pay off existing debts with funds secured from new debt" BLACK'S LAW DICTIONARY 1281 (6th ed. 1990). That is precisely what the Trust proposes to do here.

 *Third,* comparing Section A "Major Decisions" to those of Section C supports the court's determination that the proposed

decision falls under Section C(13). Section A decisions are minor and/or external decisions that do not implicate the every day management and development of 404 Wyman Street. Section A "Major Decisions" include the admission of any new partner to the Partnership, the naming of the office building constituting the Project, the development of promotional or advertising strategies for the Project, and the sale of either Partner's distributive shares.

Section C decisions differ dramatically from Section A decisions, because they relate to the development and management of 404 Wyman Street. Some of the twenty Section C "Major Decisions" include:

—the entering into any contract with an affiliated entity of any Partner;

—making any capital improvements, repairs, or alterations to the Project;

—making any expenditure exceeding $50,-000;

—the selection or removal of major vendors who work at the Project;

—the termination or modification of any lease or other arrangement involving the rental of the Project;

—the initiation, defense, settlement, compromise, or payment of any claim, obligation, debt, demand, suit, litigation or judgment by or against the Partnership;

—execution of any lease involving the Project;

—the decision whether to repair or rebuild in case of material damage to the Project;

—any modification to the Development Plan; and

—any other decision or action which by any provision of the Agreement is required to be Approved by the partner.

Based on this structure, it is quite clear that the proposed decision to purchase the note (a decision affecting the development and management of 404 Wyman Street) falls under Section C rather than Section A.

*Fourth,* interpreting the purchase of the note as falling under Section A(3) would create an unreasonable and unjust result. The proposed decision to purchase the note goes to the very heart of the Partnership's existence. The note is what enables the Partnership to develop 404 Wyman Street. Section A "Major Decisions" allows any Partner to withhold approval for any reason at all, even if unreasonable and arbitrary. To accept IBM's argument that the proposed purchase of the note falls within Section A, would create an unjust and unreasonable result by allowing IBM to unilaterally disrupt and potentially destroy the very reason the Partnership exists. *See Marcus,* 317 Mass. at 6, 56 N.E.2d at 912.

For all these reasons, the court finds that the proposed decision to purchase the note from Wyman Loan is a "Major Decision" specifically described in Section C(13).

### D. *IBM's Allegation that the Trust is in Default Does not Prevent Arbitration.*

■ Notwithstanding the conclusion that Section C applies to the dispute, IBM contends that the Trust cannot invoke the arbitration clause because it is in default of the Agreement. The court disagrees.

The Agreement anticipates two types of default. One falls under Section 9.1.1(m) and provides for default in circumstances where any Partner fails to comply with the terms of the Agreement. In these instances, the Partner alleging default has the right to initiate an arbitration to determine whether a default has actually occurred. An "Event of Default" will not occur until the arbitrator makes such a finding and the defaulting Partner fails to cure the default within thirty days after the arbitrator's decision.

Assuming *arguendo* that the Trust had failed to comply with the terms of the Agreement under 9.1.1(m), the Trust would not be deemed in be in default until an arbitrator makes that determination. The court has no power to declare an "Event of Default" under Section 9.1.1(m) because the Agreement specifically calls for that determination to be made by an arbitrator.

■ The other type of default falls under Section 9.1.1(n). Violations of Section 9.1.1(n) are serious violations which undermine the entire basis of the Partnership. Such actions are not subject to arbitration, nor is there a time period for cure. They are

acts of "fraud, intentional misrepresentation or breach of a fiduciary duty by a Partner."

IBM claims that the Trust is in default under 9.1.1(n) because the Trust's decision to have Wyman Loan purchase the note from Citicorp was a breach of fiduciary duty. IBM's blanket assertion that the Trust has breached its fiduciary duty, however, does not prevent arbitration. The court declines to adopt IBM's position. Under the IBM approach, the arbitration provisions in the Agreement would have no value, because any partner at any time could subvert the arbitration process merely by alleging a fiduciary breach. *See Riess v. Murchison,* 384 F.2d 727, 733 (9th Cir.1967) (to require before arbitration, a judicial determination of every allegation that "contractual provisions have been 'repudiated' would often cause the arbitration process ... to become valueless"), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *De Lillo Constr. Co. v. Lizza & Sons, Inc.,* 7 N.Y.2d 102, 105, 195 N.Y.S.2d 825, 827, 164 N.E.2d 95, 96 (1959) (to allow party to conclusorily frame the issue in terms of breach and repudiation, and "thereby avoid arbitration, would render the instant arbitration agreement meaningless"). Accordingly, the court concludes that IBM's assertions of default under 9.1.1(m) and 9.1.1(n) do not bar arbitration.[4]

### E. *Standard to be Applied at Arbitration*

The last question the court must address concerns the standard(s) the arbitrator will apply in deciding the dispute. Both parties agree that, if the court compels arbitration, the arbitrator should use the standard in Article XI of the Agreement. As applied to this case, the arbitrator must decide whether the purchase of the note by the Partnership at Wyman Loan's cost is a "reasonable commercial" action "consistent with the development, management, ownership and operation of a first-class suburban office building in the Greater Boston area."

The parties, however, dispute the application of the additional standard contained in Section C(13), which prevents the arbitrator from taking into account the "particular financial position of the Partners...." The Trust argues that the arbitrator should apply the standard in Section C(13). IBM disagrees and contends that if the court found arbitration justified, it should compel arbitration pursuant to Section C(1) rather than Section C(13). Section C(1) relates to contracts between the Partnership and entities related to one of the partners and states:

> any contract, lease or other form of binding agreement, whether written or oral, with any Person who the Partner proposing to make such contract, lease or other agreement knows is an Affiliate or Related Person of that Partner ...

IBM argues that the arbitrator must follow Section (C)(1), because of Wyman Loan's relationship to the Trust. The court does not need to decide this issue because it has already determined that the proposed decision is controlled by C(13). Whether any other provisions of Section C may be implicated is, in the first instance, an issue for the arbitrator.

### III.

### *CONCLUSION*

For the reasons cited above, Plaintiffs' Motion to Compel Arbitration is ALLOWED.

---

**4.** The court's decision to compel arbitration, however, in no way precludes IBM from asserting a claim for breach of fiduciary duty against the Trust at some later date in a proper judicial forum. *See Riess,* 384 F.2d at 735.