QESTEC, INC., William P. Moulin, and
Joseph W. Lawrence, Plaintiffs,

v.

Michael KRUMMENACKER,
Defendant.

No. Civ.A. 00–40107–NMG.

United States District Court,
D. Massachusetts.

Sept. 7, 2001.

Kurt L. Binder, Seder & Chandler, Worcester, MA, for plaintiffs.

Matthew E. Mitchell, Keegan, Werlin & Pabian, LLP, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

GORTON, District Judge.

This case arises out of a dispute among shareholders in a close corporation. Now pending before this Court are plaintiffs' application to compel arbitration and to stay proceedings pending resolution of arbitration (Docket No. 8) and defendant's cross motion to stay arbitration (Docket No. 11).

### I. *Background*

Plaintiff Qestec, Inc. ("Qestec") is a Massachusetts corporation with a principal place of business in Auburn, Massachusetts. Plaintiff William P. Moulin ("Moulin"), the President and a director of Qestec, is a Massachusetts resident. Plaintiff Joseph W. Lawrence ("Lawrence"), the Treasurer and a director of Qestec, is also a Massachusetts resident. Defendant, Mi-chael Krummenacker ("Krummenacker"), is a New York resident.

On December 9, 1996, Krummenacker and Qestec executed a Sales Employment Agreement ("SEA") whereby Krummenacker was hired as a Sales Executive. Paragraph 16 of the SEA is an arbitration provision which provides:

> The parties agree that they will use their best efforts to amicably resolve any dispute arising out of or relating to this Agreement. Any controversy, claim or dispute that cannot be so resolved shall be settled by final binding arbitration in accordance with the rules of the American Arbitration Association....

Paragraph 9 addresses renewal and termination of the SEA:

> A. Sales Executive's employment with the Company and the performance of this Agreement shall start on December 9, 1996 and shall continue for an "Initial Term" of one (1) year. Thereafter, the Agreement shall be renewed upon the mutual agreement of Sales Executive and Company. Notwithstanding the foregoing, this Agreement may be terminated at the discretion of either party on not less than thirty (30) business days prior notice; provided that if Company elects to terminate the Agreement pursuant to this sentence, then Company shall pay Sales Executive a severance payment of two (2) weeks average, based on six (6) months, or length of employment, whichever is the shortest. This severance payment amount shall also be paid to the Sales Executive if Company fails or refuses to renew the Agreement at the end of the Initial Term or at the end of any renewal term.
> B. Notwithstanding the foregoing, either party may terminate this Agreement without notice in the event that the other party fails to observe or perform any material obligation in this Agree-

ment. A material breach of this Agreement by Sales Executive shall include, but is not limited to failure to achieve forecasted sales; making false, fraudulent or inappropriate statements about the Company, its employees or products; engaging in any unethical, immoral or unprofessional conduct; or falsifying or misrepresenting any information to the Company. In the event that the Company terminates the employment of the Sales Executive for one of the reasons set forth in this Section 9.B, then the Company shall not be obligated to pay Sales Executive any severance pay.

When the parties entered into the SEA, Moulin and Lawrence owned all of Qestec's stock. On July 20, 1998, Krummenacker purchased 25% of Qestec's stock and was made an officer, Vice President and director of the company. At that time, Gregory Bitter ("Bitter") also purchased 25% of Qestec's stock and was made a director. As part of the transaction, Krummenacker and Bitter signed an amendment to a Cross Purchase Agreement ("the CPA") wherein they agreed to abide by the terms of the CPA. The CPA provides for the purchase of the shares of Moulin and Lawrence, as Qestec's original shareholders, upon their death, incapacity, retirement or termination of employment. Article V of the CPA, entitled "Termination of Employment", provides for the purchase of shares from a shareholder whose employment is terminated for "cause" as defined therein.

On January 26, 1999, Qestec's four shareholders/directors adopted new By-Laws pursuant to a directors action by consent. Several provisions of those By-Laws merit mention. First, Article II, Section 7 contains an arbitration provision applicable only in the event of a deadlock. Next, Article III, Section 14 lists several "core decisions" for which approval by a

quorum of the Board of Directors is required. Included on the list is "any major personnel decisions including the hiring and firing of employees ... amendment or termination of any employment contract...." Finally, Article IV, Section 2 provides that officers may be removed at any time by a vote of a majority of the Board of Directors.

On May 23, 2000, Moulin and Lawrence sent Krummenacker a memorandum notifying him that his employment was suspended until further notice and a second memorandum outlining the conditions of that suspension (collectively "the Suspension Notice"). The Suspension Notice reduced Krummenacker's compensation to $500 per week, denied him bonuses and profit sharing, terminated rental payments for Krummenacker's office in Port Jefferson, New York and prohibited further participation in Qestec's operations. As grounds for suspension the Suspension Notice listed: 1) the bad debt/revenue ratio for Krummenacker's accounts, 2) failure to meet monthly performance goals, 3) poor management skills, 4) an allegedly unauthorized $60,000 loan from Qestec to Krummenacker, 5) alleged overpayment for computer networking for the New York office, and 6) alleged harassment of a Qestec employee, to whom Krummenacker had been engaged, and her boyfriend, another Qestec employee.

A few days later, Krummenacker's New York counsel notified Moulin and Lawrence that the Suspension Notice was void in absence of action by Qestec's Board of Directors.

In response, Moulin, Lawrence and Qestec filed the instant action in Massachusetts state court alleging that Krummenacker's conduct constituted a material breach of the SEA pursuant to paragraph 9(B). Specifically, the complaint seeks 1) a declaratory judgment pursuant to M.G.L.

c. 231A and M.R.C.P. 57 that any dispute concerning the disciplinary actions taken, or to be taken, by Qestec against Krummenacker for his alleged breach of the SEA, breach of Qestec's By–Laws, breach of fiduciary duties, and other violations against Qestec and its employees must be resolved by arbitration, 2) an order compelling arbitration pursuant to M.G.L. c. 251, § 2, 3) an injunction preventing Krummenacker from taking any actions contrary to the arbitration provisions contained in the SEA and the By–Laws, and 4) a stay of the instant action pending arbitration pursuant to M.G.L. c. 251, § 2(d).

On June 5, 2000, Moulin and Lawrence convened special stockholders and directors meetings, at 10:30 a.m. and 11:00 a.m. respectively, in the office of Kurt Binder ("Binder"), Qestec's corporate counsel. At the stockholders meeting, Moulin, Lawrence, Binder and Krummenacker were present but Bitter, the fourth stockholder, had not yet arrived. Nonetheless, Moulin and Lawrence allegedly insisted on proceeding and then voted to remove Krummenacker as a director. Bitter arrived at the beginning of the directors meeting but refused to join the meeting when Binder allegedly denied access to Bitter's counsel. Moulin and Lawrence then voted to remove Krummenacker as Vice President and to terminate his employment. That same day, Moulin sent Krummenacker a letter restating the actions taken at the special meetings of stockholders and directors and demanded the immediate return of all Qestec equipment, customer, vendor and suppliers information. A follow-up latter on June 15, 2000, demanded the return of Krummenacker's company car. On June 21, 2000, Moulin and/or Lawrence allegedly notified Krummenacker's clients that he had been terminated.

On June 26, 2000, Krummenacker removed the case to this Court on diversity grounds, claiming that the amount in controversy exceeds $75,000 because his suspension/termination has caused damages to him in excess of $100,000. Shortly thereafter, Krummenacker filed an answer and counterclaim. The amended version of that counterclaim contains five counts. Count I seeks a declaratory judgment that the SEA 1) was abandoned or/rescinded by mutual consent, 2) had expired and/or terminated pursuant to its own terms, and 3) should be revoked on legal/equitable grounds. Counts II and III allege that Moulin and Lawrence breached their respective duties of good faith and loyalty owed to Krummenacker as shareholders in a close corporation. Count IV alleges that Binder breached his fiduciary duty to Krummenacker as Qestec's counsel and Count V alleges that Binder aided and abetted the alleged breach of the duty of good faith and loyalty by Moulin and Lawrence. Krummenacker also seeks injunctive relief to, *inter alia*, restore him as a director, officer and employee of Qestec and to compensate him for lost revenue, benefits, etc.

On August 25, 2000, plaintiffs filed a demand for arbitration with the American Arbitration Association.

## II. *Analysis*

Plaintiffs seek an order compelling arbitration pursuant to the arbitration clause in paragraph 16 of the SEA. Paragraph 12 of the SEA provides that it "shall be construed and enforced in accordance with the laws of the state of Massachusetts." Accordingly, this Court will apply Massachusetts law.

Arbitration clauses are "valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract" under the Mas-

sachusetts Uniform Arbitration Act ("UAA"), M.G.L. c. 251, § 1 *et seq.* Section 2 of the UAA provides that when a party refuses to arbitrate a dispute covered by a valid arbitration clause, the aggrieved party may apply to the Superior Court for an order directing arbitration. M.G.L. c. 251, § 2(a). The court will then order arbitration if it finds that a valid agreement to arbitrate exists. *Town of Danvers v. Wexler Constr. Co.,* 12 Mass. App.Ct. 160, 162, 422 N.E.2d 782 (1981). Any action involving an issue subject to arbitration must be stayed if the court compels arbitration of that issue unless the arbitrable issue is completely severable from the rest of the proceeding. M.G.L. c. 251, § 2(d).

"Whether a particular agreement calls for arbitration is a question of law for the court to decide by applying general principles of contract law." *Bank v. International Business Machines Corp.,* 915 F.Supp. 491, 495 (D.Mass.1996), *rev'd on other grounds,* 99 F.3d 46 (1996). The UAA "express[es] a strong public policy favoring arbitration...." *Id.* at 163, 422 N.E.2d 782. Indeed, the Massachusetts Supreme Judicial Court has held that:

> [u]nless there is positive assurance that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute, or unless no lawful relief can conceivably be awarded by the arbitrator, an order to arbitrate should not be denied.

*Massachusetts Coalition of Police, Local 165 v. Town of Northborough,* 416 Mass. 252, 256, 620 N.E.2d 765 (1993) (*quoting School Comm. of Danvers v. Tyman,* 372 Mass. 106, 113, 360 N.E.2d 877 (1977)). An arbitration clause which is "expressed in general terms should be construed as broadly as it was intended". *Town of Danvers,* 12 Mass.App.Ct. at 163, 422 N.E.2d 782. However, "it is fundamental that a party has no right or obligation to demand arbitration if there is no contract provision providing for it." *Unisys Fin. Corp. v. Allan R. Hackel Org., Inc.,* 42 Mass.App.Ct. 275, 280, 676 N.E.2d 486 (1997). Accordingly, this Court will discuss whether an agreement to arbitrate exists, and, if so, the scope of that agreement.

## A. Existence of an Arbitration Agreement

■ Paragraph 16 of the SEA is an express agreement to arbitrate. Krummenacker, however, argues that when he became an officer, director and shareholder of Qestec, his relationship with the company was drastically changed thereby abrogating the SEA including its arbitration clause. He therefore seeks a stay of arbitration pursuant to M.G.L. c. 251, § 2(b) on the ground that there is no agreement to arbitrate. This Court disagrees.

Prior to July 20, 1998 (the date Krummenacker became a 25% shareholder of Qestec), Krummenacker's responsibility as a sales executive was to, *inter alia,*

> develop, implement and manage a sales plan for the Company's products.... [including] development of a target account list, sales and other forecasts, management of Company's distribution channels, and coordination with Company's production, accounting and marketing personnel.

SEA, Paragraph 2(A). His base salary was $4,166.67 per month plus commissions subject to adjustment after the first six months of employment at Qestec's discretion. Krummenacker claims that he received an annual salary of $50,000 plus commissions and had no management authority.

Krummenacker contends that after he became a director, officer and shareholder of Qestec, his responsibilities and compen-

sation changed drastically. He allegedly received the use of a company car, company credit card and a $2,000 personal vacation allowance, all benefits available only to directors. He also claims that his annual salary increased to $55,000 and ultimately to $100,000, the equivalent of that received by the other directors, and that he was no longer eligible for sales commissions. He admits that he was paid on a monthly basis (as opposed to the weekly payments received by the other directors) but claims that he had the option to elect weekly payments. He allegedly assumed new duties and responsibilities, including evaluation of employee performance, establishment of employee bonuses, decision-making regarding new employees, attendance at director's meetings, acting as personal guarantor on a line of credit, and management of Qestec's Sales and Marketing Department.

Krummenacker relies on *F.A. Bartlett Tree Expert Co. v. Barrington,* 353 Mass. 585, 233 N.E.2d 756 (1968) in support of his abrogation argument. That case, however, is clearly distinguishable from the instant case. In *F.A. Bartlett Tree,* the plaintiff employer sought to enjoin the defendant, its ex-employee, from violating a non-compete clause in his employment contract. The Supreme Judicial court refused to enforce the non-compete clause, finding that fundamental changes in the employment relationship between the defendant and the plaintiff over a seventeen-year period amounted to an abandonment of the plaintiff's original employment contract. *Id.* at 587, 233 N.E.2d 756. For example, during that period plaintiff's compensation and sales area were changed and he was ultimately promoted from salesman to district sales manager. *Id.*

*F.A. Bartlett Tree* involved one employment relationship which was substantially changed in mid-stream. This case involves two parallel relationships, rather than one. On one level, Krummenacker was an employee of Qestec; on another, he was a shareholder, officer and director. Those separate roles are not inconsistent. All of the new duties and benefits cited by Krummenacker are simply duties and benefits related to his new position as a shareholder, officer and director. They constitute neither changes to the SEA nor an intention to abandon it. The fact that his salary was increased is irrelevant because the SEA provided for salary increases.

Moreover, there is no evidence that Krummenacker's duties as a sales executive changed after July 20, 1998. In fact, up until his termination, Krummenacker continued to use a business card which referred to his position as "Account Executive". Krummenacker claims that his business card contained no reference to his new titles and duties because he felt it would be easier to negotiate with customers if they did not know that he was a shareholder and director. That assertion, however, simply underscores the fact that Krummenacker maintained two distinct relationships with Qestec.

■ Krummenacker also argues that Article V of the Cross Purchase Agreement ("CPA") expressly supplants the SEA. That Article provides that if a shareholder's employment is terminated for cause, the remaining shareholders will purchase his shares at a price set elsewhere in the CPA. The definition of "cause" in Article V is somewhat different than the list of acts warranting termination under paragraph 9(B) of the SEA. That difference, however, does not indicate that the CPA supplants the SEA. The CPA deals only with the relationship between Moulin, Lawrence, Bitter and Krummenacker as shareholders. Termination of employment for any of the specified causes may trigger certain changes in

that relationship. But standing alone, the CPA is not a new employment agreement nor does it state an exclusive list of causes for which a shareholder employee may be terminated.

■ Next, Krummenacker contends that the SEA expired because the parties failed to renew it. Paragraph 9(A) of the SEA provides that it shall remain in force for a one-year term and thereafter be renewed by mutual agreement of the parties. Nothing in that paragraph requires that renewals must be made in writing. Instead, Krummenacker's continued employment by Qestec automatically renewed the SEA. By continuing to work as a sales executive and receive a salary Krummenacker implicitly assented to renewal of the SEA. Similarly, by employing him and paying the requisite salary, Qestec implicitly assented to renewal. *See Mahoney v. Hildreth & Rogers Co.*, 332 Mass. 496, 499, 125 N.E.2d 788 (1955).

Accordingly, this Court finds that the SEA was in effect when plaintiffs terminated Krummenacker's employment.

### B. Scope of the Arbitration Agreement

■ In their application to compel arbitration, plaintiffs contend that the arbitration provision of the SEA requires that the following issues be arbitrated: 1) whether the SEA was in effect at the time of Krummenacker's termination, and 2) whether that termination was proper under the SEA. This Court has just decided the first question by ruling that the SEA was in effect on the date of Krummenacker's termination as an employee of Qestec. With respect to the second question, this Court finds that the SEA's arbitration clause, which contains an agreement to arbitrate "any dispute arising out of or relating to" the SEA, expressly mandates arbitration pursuant to M.G.L. c. 251, § 2(a). The question of whether Krumme-

nacker was properly terminated pursuant to paragraph 9 of the SEA clearly arises out of the SEA.

■ In his opposition to the application to compel arbitration, Krummenacker assumes that the plaintiffs want to arbitrate not only that narrow question but also his counterclaims for breach of the duty of good faith and loyalty by Moulin and Lawrence. He protests such arbitration on the ground that the counterclaims are outside the scope of the SEA's arbitration clause. First, he argues that because fiduciary duties are imposed on shareholders in a close corporation independent of any agreement between the shareholders, his counterclaims against Moulin and Lawrence for breach of the duty of good faith and loyalty do not arise out of SEA. That argument is persuasive, *see Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 408, 649 N.E.2d 1102 (1995), and presumably Krummenacker would extend it to the counterclaims against Binder.

Second, Krummenacker contends that his counterclaims against Moulin and Lawrence also arise out of Qestec's By–Laws rather than the SEA, to the extent that those counterclaims are based on the allegation that, at the special meetings of shareholders and directors on July 5, 2000, Moulin and Lawrence failed to follow proper procedures and voting requirements set forth in the By–Laws. Again, defendant's position is well-taken. The By–Laws do not contain an applicable arbitration clause and his counterclaims are not subject to arbitration under the SEA's arbitration clause because they do not arise out of the SEA.

In any event, Krummenacker's concerns are largely moot because the plaintiffs do not seek to compel arbitration of his counterclaims. Admittedly, an arbitrator faced with the question of whether Krumme-

nacker was properly terminated according to the SEA might be forced to consider issues related to those counterclaims. For example, an arbitrator might have to decide whether such termination constituted a breach of the heightened duties owed to Krummenacker by Moulin and Lawrence as shareholders in a close corporation. The counterclaims, however, are not subject to arbitration other than in that incidental manner. This Court will, nonetheless, stay the instant litigation pending completion of limited arbitration to account for the possibility that the arbitrator's rulings may have preclusive effect on portions of Krummenacker's counterclaims.

## ORDER

For the reasons set forth in the Memorandum above:

1) Plaintiffs' application to compel arbitration and to stay this action pending resolution of arbitration (Docket No. 8) is ALLOWED. The parties will proceed to arbitrate the issue of whether defendant was properly terminated pursuant to the Sales Employment Agreement and shall file with this Court quarterly status reports thereon beginning in December, 2001;

2) Defendant's cross-motion to stay arbitration (Docket No. 11) is DENIED; and

3) In light of this order compelling arbitration, the following motions are DENIED, without prejudice to being re-filed after the completion thereof:

a) plaintiffs' partial motion for summary judgment (Docket No. 24);

b) defendant's partial motion for summary judgment (Docket No. 15);

c) plaintiffs' motion for leave to file supplemental memorandum and affidavit concerning cross-motions for partial summary judgment (Docket No. 38);

d) plaintiffs' motion to certify question of law to the Supreme Judicial Court of Massachusetts (Docket No. 25);

e) defendant's motion for an order compelling production of documents (Docket No. 18); and

f) defendant's motion for leave to amend verified counterclaim (Docket No. 17).

So ordered.