**Michael D. BANK, Thomas M. Dusel, and Robert J.M. O'Hare, Jr., in Their Capacity as Trustees of the 400 Wyman Street Trust, Plaintiffs, Appellees,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION Defendant, Appellant.**

No. 97–2289.

United States Court of Appeals, First Circuit.

Heard April 8, 1998.

Decided May 29, 1998.

---

Kenneth E. Werner, with whom J. Charles Mokriski, Jonathan I. Handler and Day, Berry & Howard were on brief, for appellant International Business Machines Corporation.

David W. Rosenberg, with whom Saul A. Schapiro, Thomas Bhisitkul and Rosenberg & Schapiro, P.C. were on brief, for appellees Michael D. Bank, Thomas M. Dusel and Robert J.M. O'Hare, Jr.

Before SELYA, BOUDIN and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

In this case, we must construe provisions of a complex partnership agreement between two sophisticated parties to a real estate development deal. We must determine whether the partnership agreement entitles one of those parties, the 400 Wyman Street Trust (Wyman), through its trustees, to call on its partner, International Business Machines Corporation (IBM), to provide a multimillion dollar capital contribution in this circumstance, involving the later refinancing of the original permanent loan. That refinancing involves the purchase of the original mortgage note, which provided the initial financing for the project, the development of an office building in Waltham, Massachusetts.

In the district court, IBM moved for summary judgment, arguing that the agreement was unambiguous and imposed no such obligation on it. Wyman opposed IBM's motion, arguing that the agreement was ambiguous and that, under Massachusetts law, Wyman must therefore be permitted to submit parol evidence in the form of the testimony of its negotiating attorneys. The district court determined that, quite apart from any parol evidence, the agreement was unambiguous in its imposition of such a capital contribution obligation on IBM, and entered summary judgment sua sponte for Wyman. We agree that the agreement unambiguously supports Wyman's position and that resort to parol evidence is therefore unnecessary. We also find no error in the district court's decision to enter summary judgment sua sponte for Wyman. We affirm.

I.

In October 1986, IBM and Wyman entered into a partnership to develop and operate an office building at 400 Wyman Street, Waltham, Massachusetts. Wyman contributed a parcel of land, valued by the parties at $19.3 million, received a majority interest of 51% in the partnership and was named the managing partner. For its part, IBM agreed to a long-term lease commitment, and also contributed $1 million at the outset of the agreement. IBM received a minority interest of 49% in the partnership. IBM also agreed to make additional capital contributions, if such contributions were "required for any purpose," so long as the two parties' "adjusted capital contributions" remained out of balance; i.e., those contributions did not reflect the 51:49 ratio of the parties' ownership shares in the partnership.

The partnership planned to finance the project through a $75 million non-recourse mortgage note (the "permanent loan"), and obtained such a loan from Citicorp Real Estate, Inc., which subsequently sold it to a consortium of foreign banks for which Citicorp served as the agent. The partnership had difficulty generating sufficient revenue to make its loan payments. In 1995, the partnership entered negotiations with the lenders to refinance the permanent loan,

which at that time had an outstanding principal balance of approximately $72 million. The lenders did not agree to a refinancing, but offered to sell the note outright for about $54 million.

Wyman believed the offer was a good solution to the partnership's problems, but IBM disagreed, regarding the price as too high. To prevent the offer from expiring, Wyman caused its corporate affiliate, Wyman Loan Corp., to purchase the note, and then proposed that the note be resold to the partnership at cost. IBM opposed the plan. Wyman sought arbitration under the agreement, which requires that disputes concerning a "refinancing" proposal be arbitrated. IBM opposed arbitration on the ground that Wyman had not yet proposed a refinancing plan, but had only proposed that the partnership purchase the initial mortgage note, and that the issue was therefore not yet arbitrable.

Wyman brought suit to compel arbitration under the agreement. The district court, agreeing with Wyman that the issue was arbitrable, granted Wyman's motion to compel arbitration. *See Bank v. International Bus. Mach. Corp. (Bank I )*, 915 F.Supp. 491, 498–99 (D.Mass.1996). This court reversed, holding that Wyman's motion to compel arbitration was premature because it had not submitted a concrete refinancing plan, but rather had proposed simply that the partnership acquire the initial mortgage note outright. This court regarded Wyman's proposal at that time as a proposal to acquire an interest in real property, which is not arbitrable under the agreement, rather than a refinancing proposal, which is. *See Bank v. International Bus. Mach. Corp. (Bank II )*, 99 F.3d 46, 49 (1st Cir.1996).

The parties could not agree to a more concrete refinancing plan in part because they could not agree on the extent of IBM's obligation to provide additional capital contributions. Wyman thought the agreement provided it with the ability to call on IBM to provide a capital contribution sufficient to bring the parties' "adjusted capital contributions" into balance, which was approximately $17.5 million, before it was obligated to seek third-party financing for the partnership. IBM did not dispute that it had some obligation under the agreement to provide additional capital, if such capital were required to complete the refinancing successfully, but thought that it was only required to contribute capital if sufficient funds could not be obtained at commercially reasonable rates from third-party lenders.

Although the parties could not resolve this issue on their own, they agreed to a settlement which capped IBM's potential liability and posed one question for resolution by the court. The settlement agreement permitted IBM to exit the partnership upon a capital contribution of $6 million. This was done. The agreement also provided that Wyman would bring a declaratory judgment action to establish which partner's interpretation of the agreement was correct. Under the settlement agreement, if Wyman won its suit, IBM would pay it an additional lump sum of $4 million.[1] If IBM won, it would be excused from any further liability under the partnership agreement.

Wyman filed the contemplated declaratory judgment action. Before any discovery had taken place, IBM moved for summary judgment in its favor, arguing that the terms of the contract were unambiguous and did not require it to make the $17.5 million capital contribution. Wyman opposed IBM's motion for summary judgment on the ground that the contract did impose such an obligation and that summary judgment was inappropriate at this stage because it wished to present parol evidence that it contended would clarify potential ambiguities in the contract. *See Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 52 (1st Cir.1996) (under Massachusetts law, "extrinsic evidence is admissible to assist the factfinder in ascertaining the intent of the parties as imperfectly expressed in ambiguous contract language"). Wyman attached affidavits to its opposition

1. Throughout this opinion we will refer to the requested capital contribution necessary to achieve Adjusted Capital Contribution Balance, defined below, as being approximately $17.5 million. We recognize that any payment that the resolution of this case requires IBM to make is reduced by the $6 million already paid and is further capped by the $4 million figure in the settlement agreement.

to summary judgment from the attorneys who had represented it during the partnership negotiations. Because we do not consider this evidence, we do not describe the contents of the affidavits.

The district court decided against IBM's motion for summary judgment. It construed the contract's language as unambiguously supporting Wyman's position. The district court did not detect any ambiguity in the terms of the contract requiring resort to parol evidence, as Wyman had argued. Although Wyman had not moved for summary judgment, the district court granted summary judgment sua sponte for Wyman, reasoning that IBM's own motion for summary judgment had given it a fair opportunity to put forward its own interpretation of the contract's terms.

IBM appeals, again arguing that the contract is unambiguous and supports its position. In the alternative, IBM argues that the district court's sua sponte grant of summary judgment was improper and that a remand for further fact-finding is appropriate if we should think the contract ambiguous. We reject both contentions.

## II.

Our review of the district court's grant of summary judgment is de novo. *Sears, Roebuck & Co. v. Goldstone & Sudalter, P.C.*, 128 F.3d 10, 15 (1st Cir.1997). Further, "[u]nder Massachusetts law, interpretation of a contract is ordinarily a question of law for the court," *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995) (internal quotation marks and citations omitted) and, as a question of law, is subject to plenary review. "Should the court find the contract language unambiguous, we interpret it according to its plain terms." *Den Norske Bank*, 75 F.3d at 52. If those plain terms unambiguously favor either side, sum-

mary judgment is appropriate. On the other hand, if the contract's terms are ambiguous, "contract meaning normally becomes a matter for the factfinder," *id.*, and summary judgment is appropriate only if "the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." *Id.* at 53 (citations, internal quotation marks and alterations omitted).

The difference in these standards is a result of the parol evidence rule, which Massachusetts follows. In Massachusetts, "[t]he parol evidence rule precludes evidence of earlier or contemporaneous discussions that would modify the provisions of a later integrated agreement which the proponent of the agreement seeks to enforce." *New England Fin. Resources, Inc. v. Coulouras*, 30 Mass.App.Ct. 140, 566 N.E.2d 1136, 1139 (1991). Both parties concede that the partnership agreement by its own terms is a fully integrated document and that it represents the whole understanding of the parties, and so, if unambiguous, cannot be modified by evidence of earlier or contemporaneous discussions. The question of whether an ambiguity exists in such an agreement is also "generally a matter of law for the court." *Wyner v. North Am. Specialty Ins. Co.*, 78 F.3d 752, 754 (1st Cir.1996). "An ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other's." *Id.* at 756 (internal quotation marks and citation omitted). Rather, a contract is only ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Coll*, 50 F.3d at 1122 (internal quotation marks, alterations and citation omitted).[2]

2. Massachusetts law also may permit, in limited circumstances, the use of extrinsic evidence "for the very purpose of deciding whether the documentary expression of the contract is ambiguous." *Donoghue v. IBC USA (Publications), Inc.*, 70 F.3d 206, 215 (1st Cir.1995). As *Donoghue* makes clear, however, the purpose of allowing such a "peek" at extrinsic evidence under some circumstances is merely to ensure that the contract is read " 'in light of the circumstances of its

execution' " rather than as some hypothetical document existing outside the parties' real business relationship. *Id.* at 216 (quoting *Robert Indus. v. Spence*, 362 Mass. 751, 291 N.E.2d 407, 409 (1973)).

In this case, the circumstances concerning the creation of IBM's and Wyman's ill-fated partnership are clearly laid out in the contract itself and in the several previous opinions addressed to this

■ With these principles in mind, we turn to the question posed in this case. Under the settlement agreement, the question posed to the court, well within our Article III jurisdiction, is this:

> In any proposal for refinancing the Partnership debt involving the purchase of the outstanding first mortgage note, does the Partnership Agreement require, unless otherwise requested by the Managing Partner, that IBM first make a capital contribution· in an amount necessary to achieve Adjusted Capital Contribution Balance (approximately $17.5 million) and, then, that the Partnership finances the balance needed to refinance the debt in accordance with the terms of the Partnership Agreement?

To answer this question, we turn to the terms of the Partnership Agreement, which sets forth a complex financial relationship between the parties.

According to § 3.1 of the Agreement, Wyman initially held a 51% interest in the partnership, while IBM was given a 49% interest. Pursuant to § 3.2, Wyman's initial capital contribution was real property, valued by the Agreement at $19.3 million, while IBM's initial capital contribution was merely $1 million in cash. Thus, each partner's initial capital contribution did not reflect that partner's respective ownership interest in the partnership on a pro rata basis.

The Agreement imposes different obligations on the parties that are contingent on whether "Adjusted Capital Contribution Balance" has been achieved. According to § 1.1(4), "'Adjusted Capital Contribution Balance' shall mean the initial point at which the Adjusted Capital Contributions of Wyman and IBM are in a 51:49 ratio," i.e. the point at which the two partners' adjusted capital contributions reflect each partner's ownership interest in the partnership in that ratio.

Section 1.1(3) defines "Adjusted Capital Contribution" as follows:

> "Adjusted Capital Contribution" shall mean the initial Capital Contribution of a Partner, increased by any subsequent Capital Contributions and reduced by any Capital Proceeds distributed to such Partner under Section 4A.2, Second and Fourth.

The Agreement's definition of "Adjusted Capital Contribution" makes clear that there are two primary ways in which Adjusted Capital Contribution Balance might be achieved. If the project generates sufficient revenue to allow for the distribution of capital proceeds to the partners, § 4A.2 sets forth the way in which such proceeds are to be distributed:

> *First,* to Wyman, until Adjusted Capital Contribution Balance has been achieved, an amount equal to 6.5% per year of the difference from time to time between Wyman's Adjusted Capital Contribution and IBM's Adjusted Capital Contribution....

> *Second,* to Wyman, until Adjusted Capital Contribution Balance.

> *Third,* to pay the unpaid outstanding balances if any, of loans made by any Partner ... to the Partnership ... plus any accrued but unpaid interest thereon.

> *Fourth,* the balance in accordance with the Distributive Shares of the Partners....

Thus, one method by which Adjusted Capital Contribution Balance could be achieved, contingent on the project generating sufficient revenue, would be for the partnership to

---

dispute. To the extent that Massachusetts permits the limited use of extrinsic evidence in order to shed light on the circumstances of the contract's execution, no such evidence would be helpful in resolving whether the contract terms in this case are ambiguous; rather, allowing such evidence would simply frustrate the policy of the parol evidence rule. As a Massachusetts court has observed:

> Claims of ambiguity ... do not hold the line against summary judgment if the documents do not reflect ambiguity on the point in question.... What a party remembers about what

was said at a business conference is easily colored by what that person wished to be resolved by the discussion. The hoped for result metamorphoses into fact. That is why lawyers draw commercial instruments to state as precisely as they can the rights and duties of the parties, and that is why the parties sign those agreements.

*USTrust v. Henley & Warren Management, Inc.,* 40 Mass.App.Ct. 337, 663 N.E.2d 1238, 1242 (1996). Therefore, as the documents are clear, we need not (and do not) rely on such extrinsic evidence.

repay Wyman for its initial capital contribution of $19.3 million from the capital proceeds of the project until a 51:49 ratio was met. That would require, assuming no additional capital contributions from either party, the partnership to distribute approximately $18.3 million to Wyman under § 4A.2 Second. That $18.3 million distribution would be, of course, over and above any distributions required to compensate Wyman at the rate of 6.5% annually for the partnership's use of Wyman's surplus capital contribution pursuant to § 4A.2 First. Only after such distributions have been made (and any loans have been repaid) would the partnership begin making payments of any capital proceeds to the partners in accordance with each partner's ownership interest.

The Agreement also contemplates another method by which Adjusted Capital Contribution Balance might be achieved. According to § 3.2(c), governing "Additional Capital Contributions by IBM":

> If the Partnership requires additional funds for any purpose ... at any time before Adjusted Capital Contribution Balance occurs, IBM upon notice from the Managing Partner shall promptly contribute the amount required (but not more than such amount as is required to effect Adjusted Capital Contribution Balance) and Wyman shall not be required to contribute any funds until Adjusted Capital Contribution Balance occurs....

Thus, if the partnership "require[d] additional funds for any purpose," Wyman could call on its partner, IBM, to make additional capital contributions up to the amount required to achieve balance. This required IBM potentially to make additional capital contributions of up to approximately $17.5 million. There is no mention in § 3.2(c) of any duty first to seek money from outside lenders.

Thus, the agreement contemplated that the initial imbalance of the two partners' capital contributions could be addressed either by a payment from the partnership to Wyman totaling approximately $18.3 million (above the 6.5% annual charge on the use of Wyman's excess capital) if capital proceeds were forthcoming, or by additional capital contributions from IBM potentially totaling approximately $17.5 million, if additional capital contributions were required, or by some combination of the two.

Once Adjusted Capital Contribution Balance occurs, however, the parties' obligations to make capital contributions change. Pursuant to § 3.3.1, entitled "need for funds":

> After Adjusted Capital Contribution Balance is achieved, if the Partnership requires additional funds for any purpose ... at any time in excess of the amounts available under the Construction Loan or Permanent Loan, the Managing Partner shall first attempt to arrange for the borrowing of such funds from independent lenders; or from a Partner or its Affiliate or Related Person, on such terms as are Approved by the Partners.... If the Partnership does not agree to borrow such funds, the Partners shall make additional Capital Contributions from time to time in accordance with the provisions herein and in the same percentages as their then respective aggregate Distributive Shares and in such amounts which are sufficient to enable the Partnership to carry out the purposes of this Agreement....

Thus, after Adjusted Capital Contribution Balance is achieved, § 3.3.1 imposes a duty on the partnership first to seek funds by borrowing from third-party lenders. If such borrowing is insufficient to supply funds that "the Partnership requires for any purpose," the partnership may then call on the partners to make additional capital contributions "in the same percentages as their then respective aggregate Distributive Shares...." Thus, if balance had been achieved and additional funds were needed above what was available from lenders, the partnership could call on Wyman to contribute 51% of the amount required and IBM to contribute the remaining 49%.

Wyman's interpretation of the Agreement is relatively straightforward. Under § 3.2(c), Wyman is given a right to make a capital call on IBM, if the partnership "requires additional funds for any purpose," up to the amount needed to achieve Adjusted Capital Contribution Balance, i.e., approximately $17.5 million. Under § 3.2(c), Wyman need make no additional contributions

nor seek outside debt financing. Because a refinancing of the original loan is a valid "purpose," this permits Wyman to call on IBM to make such an additional capital contribution before seeking outside debt financing so long as the parties' capital contributions remain out of balance. Under § 3.3, it is only after balance is achieved that Wyman has any obligation first to seek outside debt financing.

IBM acknowledges its basic obligation to make additional capital contributions, potentially totaling $17.5 million, under § 3.2(c) if the partnership "requires additional funds for any purpose." IBM also acknowledges that "any purpose" includes the purpose of refinancing the initial permanent loan. Finally, IBM also acknowledges that, generally, Wyman need not seek outside debt financing before it calls on IBM to make additional capital contributions before balance occurs under § 3.2(c), but only after balance occurs, in accordance with § 3.3. However, IBM argues that a refinancing of the permanent loan that provided the initial financing for the project represents an exception to the general terms of § 3.2(c).

IBM notes the longstanding principle of contract interpretation that "[s]pecific terms are given greater weight than general language." *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1357 (1st Cir.1992) (citing *Lembo v. Waters,* 1 Mass.App.Ct. 227, 294 N.E.2d 566, 569 (1973)). IBM argues that contract provisions specifically addressed to the permanent loan, rather than the general capital contribution provisions in §§ 3.2(c) and 3.3, should govern. IBM notes that the cornerstone of the project's initial financing is a $75 million non-recourse note secured by a mortgage on the office building. Section 3.9.2 specifies how the partnership would obtain this loan:

> The Partnership shall attempt to secure financing by a lender or lenders which (a) provides for a non-participating Permanent Loan to the Partnership on terms and conditions Approved by the Partners, in an amount not less than the greater of (i) $75,000,000 and (ii) 100% of the then current estimate of Total Project Costs (all of which are to be paid or reimbursed with the proceeds of the Permanent Loan), and so far in excess of the greater of such figures as is appropriate in light of required debt service thereon, other anticipated Partnership expenses, and anticipated Partnership income and (b) provides for the exculpation of the Partnership and its Partners from all personal liability for the payment of any interest on, or principal of, the Permanent Loan or the performance of any of the terms and conditions contained in any mortgage, deed of trust or other security instruments securing the Permanent Loan or in any collateral document except insofar as the Partners may be required to obligate themselves personally to provide such funds as may be required to obtain a Permanent Loan of at least $75,000,000....

Thus, IBM says, § 3.3.2 provides that the partnership's "Permanent Loan," which was expected to provide the financing for virtually all the partnership's expenses, should be non-recourse to the extent possible, and specifically provides that the loan should not require either partner to personally indemnify the loan unless and only to the extent necessary to obtain the loan.

Indeed, the $75 million figure, IBM argues further, was intended to provide the partnership not only with sufficient funds to pay for the operation of the project but also to repay Wyman for its disproportionate capital contribution. IBM contends that this reliance on debt financing by both parties represents, from its perspective, the linchpin of the deal; both parties would provide little equity financing, and the partnership's major financing would be a non-recourse loan secured by a mortgage on the office building itself. To obtain such a loan, IBM further notes, IBM was required to enter a long-term lease for over half of the office building, thus satisfying the lender that the office building would have at the outset an anchor tenant of the stability of a blue-chip corporation like IBM. This in turn created the risk for IBM that it would be locked into a unfavorable lease for office space. IBM finally argues that there is no textual conflict between § 3.9.2 and § 3.2(c) because the word "requires" in § 3.2(c) should be interpreted in the refi-

nancing context as incorporating a duty first to seek outside debt financing.

The two parties' differing interpretations thus depend on which provisions of the contract govern IBM's undisputed obligation to provide capital contributions in any refinancing of the permanent loan. Wyman argues that the general capital contribution obligations set forth in §§ 3.2(c) and 3.3.1 govern. According to those provisions, Wyman is permitted under § 3.2(c) to call on IBM to make additional capital contributions "[i]f the Partnership requires additional funds for any purpose" up to the amount needed to achieve Adjusted Capital Contribution Balance. Section 3.2(c) imposes no duty first to seek debt financing from independent lenders. After balance is achieved, § 3.3.1 requires Wyman first to attempt to obtain third-party debt financing before calling on the partners to make capital contributions that are proportional to their ownership interests in the partnership. Again, IBM does not dispute its obligation to provide capital contributions in a refinancing, but rather argues that the permanent loan provision, § 3.9.2, demonstrates the parties' intent to rely primarily on debt financing, and that the provisions of § 3.9.2 thus limit IBM's general obligations to provide additional capital contributions under § 3.2(c).

Without more, the contrast between § 3.9.2's reliance on debt financing for the permanent loan and the clear language of §§ 3.2(c) and 3.3.1 outlining IBM's capital contribution obligations might create sufficient ambiguity to require going outside the contract's "four corners" to determine the parties' true intent concerning IBM's capital contribution obligations in any refinancing. *See Den Norske Bank,* 75 F.3d at 52. Such *extrinsic evidence would allow the court to determine whether the parties intended to make the achievement of Adjusted Capital Contribution Balance an overriding objective,* as Wyman maintains, or whether any such goal was subordinate to the partnership's reliance on debt financing, as IBM contends.

However, resort to extrinsic evidence is not necessary because the contract itself provides an unambiguous answer to the question of which provision governs the parties' obligations in a refinancing. Exhibit D of the Agreement lays out the partnership procedure for undertaking "Major Decisions." One such decision is any refinancing of the permanent loan. Exhibit D, § C(13) describes the parties' obligations to each other in any refinancing of the permanent loan. That provision expressly provides that "the need for capital contributions shall be determined in accordance with Section 3.3 of the Agreement." Notably, Exh. D, § C(13) does *not* refer to § 3.9.2, but expressly states that § 3.3 governs the need for capital contributions in the refinancing context.

Section 3.3, in turn, lays out each partner's capital contribution obligations "[a]fter Adjusted Capital Contribution Balance [has been] achieved.…" Because balance has not yet been achieved, under § 3.3 we must look to § 3.2(c) to determine the parties' *obligations. That section, in turn, provides* that IBM has an obligation to provide up to the amount required to achieve balance (approximately $17.5 million) "[i]f the Partnership requires additional funds for any purpose.…"

■ The use of the words "for any purpose" clearly lays out a very broad obligation to provide additional capital contributions to the Partnership. We do not agree with IBM's argument that the word "requires" limits this obligation to providing additional capital contributions only if financing cannot be obtained from third-party lenders. Such an interpretation of "requires" would import the obligation to seek debt financing contained in § 3.3.1, operative only after balance is achieved, into § 3.2(c), operative before balance is achieved. Section 3.2(c) contains no express obligation to seek funding first from outside lenders, and this is plainly not accidental. To interpret § 3.2(c) as implicitly containing such an obligation would contradict the parties' expressed intent to provide *for different capital contribution obligations* depending on whether the parties' adjusted capital contributions had achieved balance or not.

■ IBM's proposed interpretation of "requires" in § 3.2(c) as incorporating a duty to seek debt financing in the refinancing

context also creates linguistic problems, by creating a redundancy. Both §§ 3.2(c) and 3.3.1 limit the parties' obligations to provide additional capital contributions to circumstances in which the partnership "requires additional funds for any purpose...." If the word "requires" already incorporates a duty first to seek debt financing in any refinancing, it would eliminate the reason for the express language in § 3.3.1 which imposes on the partnership, after balance is achieved, an obligation first to seek debt financing before calling on the partners to contribute additional capital. A contract should be interpreted as a whole, so that each of its provisions has operative effect. *See Bank One Texas, N.A. v. A.J. Warehouse, Inc.*, 968 F.2d 94, 97–98 (1st Cir.1992); *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 494 N.E.2d 374, 378 (1986). IBM essentially argues that the word "requires" in § 3.2(c) implicitly imposes a duty to seek debt financing identical to the duty expressly imposed by § 3.3.1. Such an interpretation does not square with the identical use of the word "requires" in § 3.3.1.

IBM notes that Exh. D, § C(13) refers expressly to § 3.3, but not to § 3.2(c). IBM construes this omission to express an intent to impose the duty to seek third-party debt financing contained in § 3.3 in all refinancing proposals, regardless of whether Adjusted Capital Contribution Balance had been achieved. Otherwise, IBM argues, Exh. D., § C(13) would expressly refer to both §§ 3.2(c) and 3.3. The difficulty with this argument is that it requires us to ignore the text of § 3.3, which expressly applies *only* "[a]fter Adjusted Capital Contribution Balance [has been] achieved...." Although an express reference to both §§ 3.2(c) and 3.3 might have been more artful drafting, the reference to § 3.3 alone is sufficient to lead the reader from § 3.3 to § 3.2(c). Section 3.3 is applicable only after balance is achieved; § 3.2(c) explains how the partnership can call for capital contributions before balance is achieved.

IBM's next argument for imposing a duty on the partnership to seek outside debt financing is based on the definition of "Permanent Loan," which the Agreement defines as "such long term financings or refinancings,

whether one or more, which are described in Subsection 3.9.2." Agreement § 1.1(50). This definitional provision is too thin a reed on which to rely, given the statement in Exh. D, § C(13), governing any proposal for refinancing, that "the need for capital contributions shall be determined in accordance with Section 3.3 of the Agreement."

Of course, the definitional provision, § 1.1(50), states that the provisions of § 3.9.2 generally apply to both the initial financing and to any refinancing proposal. Yet the provisions of § 3.9.2 are drafted with the initial permanent loan in mind, and not all of them make sense as applied to a refinancing. For example, § 3.9.2 instructs the parties to obtain a loan of at least $75 million, but a refinancing, obtained after some of the principal of the initial loan had been paid and perhaps on more favorable terms, would likely involve a loan for a smaller amount (as it did here). IBM does not argue that § 3.9.2 imposes an obligation in any refinancing proposal to maintain indebtedness of at least $75 million. Rather it admits that § 3.9.2 does not apply "to its full, literal extent" in the refinancing context, and given that the provision's terms were apparently drafted with the initial permanent loan in mind, we are inclined to agree.

Moreover, the question in this case concerns capital contribution obligations, a topic not directly addressed by § 3.9.2. Exh. D, § C(13) provides expressly that in any refinancing the "need for additional capital contributions" is governed by the general provisions of the Agreement concerning such contributions, i.e. § 3.3 and § 3.2(c) (by implicit reference), not by any allegedly different rules created by § 3.9.2. Therefore, whatever relevance the requirements of § 3.9.2 have to a refinancing plan in general, it is plain that § 3.3, and therefore § 3.2(c), govern the parties' obligations to provide additional capital contributions as part of any refinancing. Those provisions impose a duty first to seek outside debt financing only after Adjusted Capital Contribution Balance is achieved.

IBM's final objection is that an interpretation which permits the partnership to require an additional capital contribution

of up to $17.5 million in any refinancing would render the contract irrational. Under Massachusetts law, "a contract should be construed so as to give it effect as a rational business instrument." *McMahon v. Monarch Life Ins. Co.,* 345 Mass. 261, 186 N.E.2d 827, 830 (1962). IBM poses various hypothetical scenarios designed to show that allowing Wyman to trigger a large capital contribution obligation, potentially totalling $17.5 million, simply by proposing a refinancing plan renders the deal's reliance on debt-financing meaningless. This, IBM contends, could not represent the reasonable expectations of the parties. *See id.*

IBM's parade of horribles ignores the important safeguards against such overreaching which the Agreement itself incorporates. First, as to the initial financing, § 3.9.2 requires the partnership to seek a loan "in an amount not less than the greater of (i) $75,-000,000 and (ii) 100% of the then current estimate of Total Project Costs. ..." This provision thus requires the partnership to seek an initial loan that is at least large enough to cover all of the partnership's needs, and in no event less than $75 million. Under § 3.9.2, then, IBM would not be required to make any additional capital contribution at the time of the initial financing plan unless the partnership fell short of its borrowing goals.

Second, as to any refinancing plan (in which, as IBM acknowledges, the requirement to maintain the same level of indebtedness would not apply), it is true that IBM could be required to make an additional capital contribution, potentially totaling $17.5 million, so long as Adjusted Capital Contribution Balance had not been achieved.[3] Yet this does not leave IBM without recourse. Under Exh. D, § C(13), any refinancing proposal is a "Major Decision." Although the Agreement does not give IBM the power to veto a refinancing proposal, as it does with some other decisions,[4] IBM can demand arbitration of any refinancing proposal under Article XI of the Agreement. That provision requires a neutral set of arbiters, experienced in the Boston real estate market, to consider the commercial reasonableness of any refinancing proposal. If Wyman proposed a refinancing plan which was not in the partnership's best interests but was merely a pretext to force IBM to make a capital contribution, then IBM could challenge the refinancing proposal itself before the arbitration panel.

These safeguards would prevent Wyman from abusing its power as Managing Partner under § 3.2(c) to call on IBM to make additional capital contributions in any refinancing proposal. They do not, however, limit the partnership's ability to call on IBM to make additional capital contributions in an otherwise reasonable refinancing plan. Giving Wyman such authority is not so commercially irrational that it would cause us to question our interpretation of these unqualified and unambiguous provisions requiring IBM to make a capital contribution as part of a commercially reasonable refinancing proposal. Wyman may well have decided to agree to a partnership in which IBM's initial capital contribution was small only because it had the broad authority under § 3.2(c) to call on IBM to make additional capital contributions that were appropriate for the partnership's needs. The text of the Agreement makes clear that this authority was not circumscribed by a duty to seek outside debt financing first in any refinancing arrangement. It is not for the courts to upset the deal that the parties have made.

We therefore conclude, as did the district court, that the Agreement's text provides an unambiguous answer to the question the parties have posed in this declaratory judgment

---

3. We note that this obligation would not, of course, be so large if the partnership had been profitable enough to generate sufficient capital proceeds to repay Wyman through distributions under § 4A.2 Second, as the parties undoubtedly hoped would occur.

4. Exhibit D of the Agreement creates different procedures for resolving different decisions. Decisions described in Section A (such as the pur-

chase of real property) require both parties' consent; i.e., IBM has a veto. With respect to decisions described in Section C, which includes refinancing the permanent loan, "a Partner may not unreasonably withhold or delay its approval...." Instead, "a deadlock on any one or more of them will trigger the arbitration provisions...."

action. In any proposal for refinancing the Partnership debt involving the purchase of the outstanding first mortgage note, the Partnership Agreement requires, unless otherwise requested by the Managing Partner, that IBM first make a capital contribution in an amount necessary to achieve Adjusted Capital Contribution Balance (approximately $17.5 million) and, then, that the Partnership finance the balance needed to refinance the debt in accordance with the terms of the Partnership Agreement.

One final issue remains. This case was *not* resolved on cross-motions for summary judgment; rather, Wyman opposed IBM's motion for summary judgment on the ground that the contract was ambiguous, that discovery was needed to ascertain the true intent of the parties through resort to parol evidence, and that summary judgment was therefore premature.

The touchstone in our review of the district court's decision to grant Wyman summary judgment sua sponte is whether IBM was afforded appropriate notice and a fair opportunity to present its arguments. *See Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir.1996). Sua sponte summary judgment is also appropriate only if the litigation is sufficiently advanced that both parties have had a reasonable opportunity to present any material evidence in their favor. *See id.*

If the district court had ruled for Wyman on the ground that the agreement was ambiguous and that parol evidence demonstrated that Wyman's position was correct, we would in all likelihood agree with IBM. As Wyman had argued that more discovery was necessary, such a ruling would have presented serious problems of unfair surprise to IBM, which was entitled to develop parol evidence of its own if it failed to convince the court on its purely textual argument and would have had no opportunity to request additional discovery under Fed.R.Civ.P. 56(f). But the district court ruled that the agreement was unambiguous and that it supported Wyman's position. This court has affirmed the decision of the district court on the same basis.

IBM's motion for summary judgment in its favor was premised on a theory that the contract was unambiguous and supported its position. IBM's own summary judgment motion, in the circumstances of this case, gave IBM ample opportunity to explain its understanding of the contract terms and to set forth its interpretation of the contract's text. As neither the district court nor this court considered resort to extrinsic evidence necessary, no further discovery was warranted. We therefore find no error, given the circumstances of this case, in the district court's sua sponte grant of summary judgment.

We make one final observation. Both sides have been served well by very able counsel. Further, the efforts of counsel to resolve this matter, or so much of it as they were able, are to be commended. Through the settlement, in a very real sense, both sides have won.

The judgment of the district court is *affirmed.*