Tommy Hilfiger v. N. Conway Outlets    CV-99-147-B    2/14/00

UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Tommy Hilfiger Retail, Inc.

    v.                                   Civil No. 99-C-147-B
                                        Opinion No. 2000 DNH 038
North Conway Outlets LLC


MEMORANDUM AND ORDER

Tommy Hilfiger Retail, Inc. ("Hilfiger") entered into a long-term commercial lease with North Conway Outlets ("NCO"), a developer that planned to build a retail outlet shopping center in North Conway, New Hampshire. NCO failed to complete construction of the shopping center by the deadline specified in the lease. The issue presented by this declaratory judgment action is whether NCO is entitled to invoke a clause in the lease excusing any delay in completing construction caused by "governmental restrictions."

I.    BACKGROUND

On January 16, 1997, after a period of negotiation, Hilfiger and NCO entered into a seven year commercial lease for retail

space in a shopping center NCO planned to build in North Conway, New Hampshire. See Aff. of Steven R. Gursky, Esq. ¶ 2 [hereinafter Gursky Aff.]; Aff. of Jordan D. Warshaw ¶ 2 [hereinafter Warshaw Aff.]. Under Section 6.2 of the lease, NCO agreed that

> construction of the demised premises to the extent required of [NCO] shall be substantially completed by not later than twelve (12) months following October 1, 1997 <u>unless</u> [NCO's] failure so to complete is caused by <u>governmental restrictions</u>, strikes, walkouts, shortages of material or labor, act of God, enemy actions, civil commotion, fire or casualty, <u>or any other causes beyond the reasonable control of [NCO]</u>, in which event the aforesaid date shall be extended for such period as [NCO] is so prevented from completing such construction. If such substantial completion has not been achieved by the aforesaid date, as extended as aforesaid, [Hilfiger] and [NCO] shall have the right to terminate this lease by giving written notice of such termination to the other within thirty (30) days thereafter.

Gursky Aff. Ex. A § 6.2 (emphasis added).

On March 20, 1997, the Conway Planning Board ("Planning Board") granted final site plan approval for NCO's project. See Warshaw Aff. ¶ 4. Mountain Valley Mall Associates ("MVMA"), a shopping mall located across the street from NCO's proposed

-3-

development, appealed the Planning Board's grant of final approval to both the Conway Zoning Board of Adjustment ("ZBA") and the New Hampshire Superior Court. See id. ¶ ¶ 3, 5, 6. The ZBA refused to hear the matter and MVMA appealed the ZBA's decision to superior court. See id. ¶ ¶ 5, 6. The Superior Court affirmed both the Planning Board's grant of final site plan approval and the ZBA's refusal to consider MVMA's appeal. See id. ¶ 7.[1] MVMA then appealed both decisions. The New Hampshire Supreme Court affirmed both decisions on February 3, 2000. See id. ¶ 8.

NCO did not begin construction of the planned shopping center by the October 1, 1998 substantial completion date specified in the lease. Shortly after the deadline expired, Hilfiger notified NCO that it had breached the lease and that

---

[1] The Superior Court dismissed MVMA's ZBA appeal because MVMA's "planning board claims [had] already been adjudicated and [its] ZBA appeal was not preserved through proper exhaustion of administrative remedies." Mountain Valley Mall Assocs. v. Municipality of Conway and Conway Zoning Bd. of Adjustment, No. 97-E-125, slip op. at 6 (N.H. Super. Ct., Carroll County Feb. 11, 1998).

-4-

Hilfiger was exercising its right to terminate.  See id. Ex. C. NCO responded by claiming that it could not build the shopping center because MVMA had appealed the land use approvals NCO needed to begin construction.  See id. Ex. D. NCO argued, therefore, that the time for completing construction was extended because its inability to build was due to a cause beyond its reasonable control.  See id.  It has since also argued that its inability to meet the substantial completion deadline must be excused because its inability to build was the result of governmental restrictions.  Hilfiger commenced this declaratory judgment action to resolve the dispute.  It now seeks summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  See Fed R. Civ. P.

56(c); <u>Commercial Union Ins. Co. v. Walbrook Ins. Co.</u>, 7 F.3d 1047, 1050 (1st Cir. 1993). A material fact is one "that might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

Summary judgment is appropriate to resolve a question of contract interpretation "only if the meaning of the language is clear," in light of the surrounding circumstances and the undisputed evidence of the parties' intent. <u>See</u> <u>Rodriguez-Abreu v. Chase Manhattan Bank, N.A.</u>, 986 F.2d 580, 586 (1st Cir. 1993) (noting that there must be "no genuine issue as to the inferences which might reasonably be drawn from the language"). A dispute over the proper interpretation of the pertinent contract provision does not necessarily give rise to a "genuine issue." <u>See</u> <u>Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. and Urban Dev.</u>, 768 F.2d 5, 8 (1st Cir. 1985). If the words of

the contract are so clear that "reasonable people could not differ over their meaning," the contract language is unambiguous and the court decides the issue of proper interpretation. Id.; see also United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995). To prevail under these circumstances, the moving party must demonstrate that its interpretation of the unambiguous language is correct. See Allen v. Adage, Inc., 967 F.2d 695, 701 n. 5 (1st Cir. 1992).

In contrast, summary judgment generally is inappropriate if the meaning of contract language is ambiguous and the extrinsic evidence bearing on the meaning of the ambiguous language is contested.  See id. at 698 n. 3.  In such circumstances, summary judgment is appropriate only if the extrinsic evidence of the parties' "intended meaning is so one-sided that no reasonable person could decide to the contrary."  Bank v. International Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998) (internal quotation marks and citations omitted); Allen, 967 F.2d at 698 (same).

Applying the summary judgment standard in the context of the present case, Hilfiger will not be entitled to judgment if the contract language plausibly could be construed to excuse NCO's non-performance and the extrinsic evidence bearing on the issue would permit this construction.

## III.  **DISCUSSION**

Hilfiger presents two arguments to support its summary

judgment motion.  First, it challenges NCO's assertion that

MVMA's appeals prevented it from completing construction by the

date specified in the lease. Second, it argues that the pendency of an appeal challenging a necessary land use approval cannot excuse NCO's nonperformance. I address each contention in turn.

A.   Did MVMA's Appeals Preclude NCO From Building?

Hilfiger cites the fact that NCO obtained a building permit from the Town of Conway to support its argument that MVMA's challenges to the site plan approval did not prevent NCO from commencing construction. I reject this argument because it is inconsistent with New Hampshire law.

Once the superior court granted certiorari and accepted MVMA's appeal of the final site plan approval, the approval was automatically stayed by operation of New Hampshire law.[2] See N.H. Rev. Stat. Ann. § 677:15 ("the allowance of the order shall stay proceedings upon the decision appealed from"). Moreover, MVMA's timely appeal of the superior court's ruling upholding the

_____

[2] Unlike an appeal of an adverse planning board decision, an appeal challenging an adverse ruling by a ZBA does not automatically stay the ZBA's decision. See N.H. Rev. Stat. Ann. § 677:9. Accordingly, I focus my analysis on the effect of MVMA's appeal of the final site plan approval.

-10-

approval stayed the entry of final judgment while the appeal was pending. See Super. Ct. R. 74 (1999); Rollins v. Rollins, 122 N.H. 6, 9 (1982) ("Superior Court Rule 74 provides that a decree does not go to final judgment if a timely appeal is taken to this court"). No evidence has been presented to suggest that NCO obtained relief from this automatic stay. Accordingly, New Hampshire law prevented NCO from acting on the final site plan approval while the appeal was pending. The building permit on which Hilfiger relies, therefore, was not lawfully issued and it could not entitle NCO to commence construction while the appeal of the site plan approval was pending.

B.   **Can Section 6.2 Reasonably Be Interpreted to Excuse NCO?**

Because I conclude that New Hampshire law prevented NCO from beginning construction by the substantial completion date specified in the lease, I must address the second question presented by Hilfiger's motion for summary judgment: whether Section 6.2 of the parties' lease can reasonably be interpreted to excuse NCO's delay in performance due to the suspension of the

-11-

grant of site plan approval.  To resolve this question, I first consider the relevant New Hampshire precedents governing contract interpretation.  I then apply these precedents to the language of Section 6.2.

### 1.  Rules of Contract Interpretation

A lease is a type of contract and should be interpreted according to the standard rules of contract interpretation.  <u>See</u> <u>Hampton Beach Casino, Inc. v. Town of Hampton</u>, 140 N.H. 785, 788, 674 A.2d 979, 981 (1996); <u>Echo Consulting Servs., Inc. v. North Conway Bank</u>, 140 N.H. 566, 569, 669 A.2d 227, 230 (1995).  As with any contract, the proper interpretation of a lease ultimately presents a question of law for the court to decide.  The court's objective must be to give the contract the interpretation which best reflects its reasonable meaning and the parties' intention when they executed the contract.  <u>See</u> <u>Alexander v. Blackstone Realty Assocs.</u>, 141 N.H. 366, 368-69, 684 A.2d 60, 62 (1996); <u>Gamble v. University Sys. of New Hampshire</u>, 136 N.H. 9, 13, 610 A.2d 357, 360 (1992); <u>Woodstock Soapstone Co.</u>

v. Carleton, 133 N.H. 809, 815, 585 A.3d 312, 315 (1991); Restaurant Operators, Inc. v. Jenney, 128 N.H. 708, 710, 519 A.2d 256, 258 (1986). The first step in this process is determining whether the disputed lease term is ambiguous. The court resolves this threshold issue as a matter of law. See Bank, 145 F.3d at 424; Echo Consulting Servs., 140 N.H. at 569, 669 A.2d at 230.

Contract language is ambiguous if "parties to the contract reasonably disagree as to the meaning of that language." Woodstock Soapstone Co., 133 N.H. at 815, 585 A.2d at 315 (citations omitted); see also Bank, 145 F.3d at 424. Ambiguity does not exist simply because the parties, "each favoring an interpretation contrary to the other's," dispute the proper meaning of contract language. Bank, 145 F.3d at 424 (internal quotation marks and citation omitted). "If only one interpretation is reasonable, the contract is deemed unambiguous." URI Cogeneration Partners, L.P. v. Board of Governors For Higher Educ., 915 F. Supp. 1267, 1281 (D.R.I. 1996) (citing W.P. Assocs. v. Forcier, 637 A.2d 353, 356 (R.I. 1994)).

If the contract is unambiguous, then "the intent of the parties to a lease is to be determined from the plain meaning of the language used." Echo Consulting Servs., 140 N.H. at 569, 669 A.2d at 230; see also Anderson v. Century Prods. Co., 943 F. Supp. 137, 152 (D.N.H. 1996). In gleaning the parties' intent from the plain meaning of the lease language, the entire lease

-14-

must be examined and its terms must be given "the standard meaning as understood by reasonable people."  <u>Echo Consulting</u>

Servs., Inc., 140 N.H. at 569, 669 A.2d at 230.  In addition, it is necessary to "consider the situation of the parties at the time of their agreement and the object that was intended thereby."  Hampton Beach Casino, Inc., 140 N.H. at 789, 674 A.2d at 981 (citing Appeal of Dell, 140 N.H. 484, 488, 668 A.2d 1024, 1029 (1995)); Butler v. Walker Power, Inc., 137 N.H. 432, 435, 629 A.2d 91, 93 (1993).

In contrast, if a contract is deemed ambiguous, then surrounding circumstances and extrinsic evidence are considered to determine the parties' intent.  See Rodriguez-Abreu, 986 F.2d at 586; Anderson, 943 F. Supp. at 152.

   2.   Interpreting Section 6.2 According to the
        Rules of Contract Interpretation

Hilfiger argues that the automatic stay of the final site plan approval required by New Hampshire law does not excuse NCO's nonperformance because it is neither a governmental restriction nor a cause beyond reasonable control.

According to Hilfiger, the term "governmental restrictions" refers to governmental action that is both unforeseeable and

temporary in duration.  It asserts that this term is intended to

include only something like a "a temporary construction moratorium to prevent excessive electrical use during a heat wave, or . . . some analogous action of a temporary and unforeseeable nature." Pl.'s Mem. of Law in Supp. of Its Mot. for Summ. J. at 6 (doc. no. 14). A suspension of a final site plan approval resulting from an abutter's challenge to the approval is not a governmental restriction, so Hilfiger argues, because such a challenge is foreseeable, given that abutters have standing to appeal Planning Board decisions.

Assuming without deciding that Hilfiger has proffered a plausible construction of the term "governmental restrictions" it interpretation is by no means the only plausible construction. A commonly accepted dictionary definition of "restriction" is "something that restricts; a restrictive condition or regulation; limitation." Random House Unabridged Dictionary 1642 (2d ed. 1993). To "restrict" means "to confine or keep within limits, as of space, action, choice, intensity, or quantity." Id. A governmental restriction, therefore, reasonably can be understood

as any limitation on action, or restrictive condition, imposed by the government that prevents NCO from completing construction.

The context in which the term is used in the lease gives no hint that the parties intended a more restrictive interpretation.

Hilfiger argues, however, that the only reasonable way to construe the governmental restrictions term is to limit it to unforeseeable governmental restrictions. To support its position, Hilfiger cites the District of Rhode Island's decision in <u>URI Cogeneration Partners, L.P. v. Board of Governors.</u>, 915 F. Supp. 1267 (D.R.I. 1996).

In <u>URI Cogeneration Partners, L.P.</u>,[3] the plaintiff, UCP, planned to build and operate a power plant on the property of its customer, the defendant, the University of Rhode Island ("URI"). Even before the parties executed their agreement, they were aware that UCP might need to obtain zoning approval for the project in order to obtain necessary financing. Although the URI did not believe that it was subject to the zoning jurisdiction of the community in which its campus was located, the parties' agreement gave UCP the discretion to decide whether it would pursue zoning

_____

[3] For purposes of this discussion, I present a simplified version of the facts.

-20-

approval.  <u>See</u> <u>URI Cogeneration Partners, L.P.</u>, 915 F. Supp. at

1273-74.  An exhibit to the agreement, which was incorporated therein, stated that UCP needed to obtain zoning approval as a prerequisite to obtaining financing.  See id. at 1277.  UCP opted to seek zoning approval, but the local board "tarried over the matter for the next two years."  Id.  Due to this delay, UCP failed to achieve certain milestones by the dates established in the parties' agreement.  As a result, URI terminated the agreement.  See id. at 1278.

UCP argued that its delay in performance was excused by a "catchall" provision in the agreement's force majeure clause.  See id. at 1276, 1286 ("'causes beyond the reasonble control of and without the fault or negligence of the party claiming Force Majeure.'").  The court rejected this argument.  In doing so, it noted that a "catchall" provision in a force majeure clause is limited to "things of the same kind of nature as the particular matter [sic] mentioned."  Id. at 1287 (quoting Kel Kim Corp., 519 N.E. 2d at 296-97).  Since the clause at issue did not specifically list the failure to obtain governmental approvals as

an excusable condition and all of the specific conditions listed in the clause were unforeseeable, the court reasoned that the

catchall clause should similarly be limited to unforeseeable events. See id. Accordingly, the court reasoned that UCP could not invoke the catchall clause because the denial of zoning approval was foreseeable when the parties entered into the agreement. See id.

Because the force majeure clause did not expressly allocate the risk of a failure to obtain the zoning approval, the court fell back on the common law rule of risk allocation. "Under the common law, 'if governmental approval is required for a party's performance, the party may be taken to assume the risk that approval will be denied if there is no provision excusing the party in that event.'" Id. at 1287(quoting 2 E. Allan Farnsworth, Farnsworth on Contracts § 9.6 (1990)). Accordingly, the court concluded that UCP, which voluntarily assumed the obligation of securing zoning approval, bore the risk that such approval would be denied. As a result, its delay in performing its obligations under the contract was not excused. See id. at 1288.

Although relevant and instructive, URI Cogeneration

-24-

<u>Partners, L.P.</u> is distinguishable and therefore does not dictate the result in this case.  Here, "governmental restrictions" is

specifically listed "among the parade of horribles triggering"

Section 6.2's application.  See id. at 1287.  Further, in the

absence of contract language or extrinsic evidence suggesting

that a more limited meaning was intended, a stay of a necessary

approval that automatically goes into effect by operation of law

when an appeal is taken is a limitation on NCO's ability to build

that reasonably can be viewed as a governmental restriction.  As

a result, the lease arguably allocates the risk of delay due to

an automatic stay of a necessary approval to Hilfiger rather than

NCO.  Under these circumstances, the common law rule allocating

the risk of a failure to obtain a necessary approval to the party

seeking the approval is irrelevant.[4]


**IV.  CONCLUSION**

Because NCO has not filed a cross-motion for summary

_____

[4]  Because I conclude that NCO's inability to complete
construction by the deadline specified in the lease plausibly
could be understood as a governmental restriction excusing its
failure to meet the substantial completion deadline, I need not
also consider whether it could also qualify as a cause beyond
NCO's reasonable control.

-26-

judgment, I reserve judgment on the precise meaning of the

language in Section 6.2 of the lease.  For the foregoing reasons, however, I deny Hilfiger's motion for summary judgment (doc. no. 14).

SO ORDERED.

                                           _____
                                           Paul Barbadoro
                                           Chief Judge

February  , 2000

cc:  Stephen Grill, Esq.
     John LaLiberte, Esq.